**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

**UNITED STATES OF AMERICA,**

    **- against -**                       **13-CR-368 (DLC)**

**MARK MARMILEV, *et al.*,**

                  **Defendants.**

--------------------------------------------------------x


**MARK MARMILEV'S MOTION AND SUPPORTING**
**MEMORANDUM FOR RELEASE ON BAIL PENDING TRIAL**


**SETH GINSBERG**
**Attorney at Law**
**299 Broadway, Suite 1405**
**New York, New York 10007**
**212-537-9202**
**srginsberg@mac.com**

***Attorney for Mark Marmilev***

## Table of Contents

Application..................................................................................................................... 1

Overview...................................................................................................................... 1

Argument: The Court Should Release Marmilev on Bail Because a Combination of
Conditions Will Adequately Ensure His Appearance in Court and the Safety of the
Community. ................................................................................................................. 4

    A.    Overview of Governing Legal Principles ...................................................... 4

    B.    The Nature and Circumstances of the Offense and the Weight of the Evidence
        Support Releasing Marmilev on Bail. .......................................................... 7

        1.    Overview of the Rise and Decline of Liberty Reserve ........................ 7

        2.    The Charges Against Liberty Reserve Are Speculative and the Government's
            Case Is Weak.................................................................................. 10

        3.    Substantial Evidence Exists Demonstrating that Liberty Reserve Implemented
            Anti-Money Laundering Protocols and Cooperated with Requests from
            Government Authorities Regarding Suspicious Activity. ......................... 16

        4.    The Outcome in *United States v. E-Gold* Undercuts the Strength of the
            Government's Case......................................................................... 19

        5.    Marmilev Had a Limited Role in Liberty Reserve. .................................. 20

        6.    Regulations for Virtual Currencies Did Not Exist When LR Was Formed and
            Are Only Now Being Formulated............................................................ 21

    C.    Marmilev's History and Characteristics Support His Release on Bail. ......................... 24

    D.    Marmilev Can Post Adequate Security to Ensure His Presence in Court and the
        Safety of the Community. ............................................................................ 26

    E.    Due Process Supports Marmilev's Release on Bail. ..................................... 27

Conclusion .................................................................................................................. 31

**Application**

Pursuant to 18 U.S.C. § 3142, we respectfully request that the Court enter an order releasing Mark Marmilev from custody pending trial upon a Seven Hundred and Fifty Thousand Dollar ($750,000.00) bond secured by real property with equity of Four Hundred and Forty Thousand Dollars ($440,000.00), currency in the amount of One Hundred Thousand Dollars ($100,000.00), and the signatures of two financially responsible people.

We submit that the proposed bail package will adequately ensure Marmilev's appearance in court and the safety of the community.

**Overview**

Liberty Reserve ("LR")—a web-based prepaid currency service—was a pioneer on the frontier of the digital financial industry that had made substantial inroads developing a secure and efficient means of conducting financial transactions on the internet.  With approximately 50 employees, including financial, legal, and technical professionals, LR was poised to be the dominant force in the world of online financial transactions.

As is the case for many trailblazers, however, LR ventured into territory that was largely unregulated and without useful guideposts.  LR, therefore, worked closely with financial regulators in Costa Rica—where it was incorporated and maintained its headquarters—to develop and implement appropriate regulations and procedures.

LR worked successfully with Costa Rican authorities for approximately four years during which time it continually adopted new procedures and complied with the requirements of Costa Rican regulators.  In addition, LR had customers in countries around the globe and—other than the United States—not a single country took issue with LR or its business practices. Moreover, on several occasions, LR voluntarily assisted in law enforcement investigations.

1

On May 24, 2013, however, the government arrested Mark Marmilev based upon charges stemming from his employment with LR. Specifically, the government charges Marmilev with conspiracy to commit money laundering, conspiracy to operate an unlicensed money transmitting business, and operation of an unlicensed money transmitting business. Indictment, 13-CR-368 (DLC), (the "Indictment"). Based upon the Indictment and the limited portion of the massive discovery that we have thus far been able to review, it appears that the government's approach with respect to Marmilev is guilt by association.

Tellingly, in an uncharacteristically long 13-page preamble to the statutory allegations against Marmilev and his co-defendants, there is hardly a mention of Marmilev. Indictment at ¶¶ 1-29. Indeed, the government implicitly concedes that Marmilev had no responsibility for licensing and other regulatory matters—the core of the charges—because Marmilev was "principally responsible for designing and maintaining Liberty Reserve's technological infrastructure." Indictment at ¶ 7.

Moreover, the government's thesis upon which it postulates that LR was designed to facilitate money laundering is fundamentally flawed. In sum, the government argues that, because it has obtained evidence that certain criminals favored LR for their criminal transactions, LR was, therefore, designed for criminal use. The frailty of the government's logic is apparent upon consideration of the fact that criminals also favor PayPal, Western Union, and even cash in the form of the United States Dollar for criminal transactions and yet no one suggests that these forms of payment were designed to facilitate money laundering—despite the prevalence of their use for that purpose.

Furthermore, assuming *arguendo* that some within LR had such a purpose in mind, their criminal intent would not extend to Marmilev in his capacity as a technical expert any more than

2

an information technology professional at a major bank would be responsible for the illegal activities of the bank's principals—putting to one side the fact that, despite widespread fraud throughout the banking industry in recent years, the government has not seen fit to prosecute any such individuals but rather has pursued financial settlements.

As we discuss in detail below, the factors that the Court must consider in making a determination regarding bail weigh strongly in favor of releasing Marmilev, including the nature and circumstances of the offense, the weight of the evidence, and Marmilev's history and characteristics, including the fact that he does not have a criminal record, has strong ties to New York, and made no effort to flee prior to indictment—despite clear indications from law enforcement that an investigation was pending.

In addition, as also discussed below, due process concerns weigh in favor of release on bail based upon the projected length of time that Marmilev will be incarcerated if held until the conclusion of trial – a solid two years in jail assuming that the current schedule remains in tact.

As the Court is aware, the Bail Reform Act encourages release pending trial except in a limited number of circumstances.  Here, given the substantial financial incentive to honor the terms of his release, as well as the considerable moral suasion present in light of the fact that his release will be secured by the homes and finances of family and friends, the proposed bail package should provide the Court with ample assurance that Marmilev will scrupulously abide by whatever conditions the Court deems fit to impose.  In addition, as noted, due process concerns also support releasing Marmilev on bail pending trial.

**Argument**

**The Court Should Release Marmilev on Bail Because
a Combination of Conditions Will Adequately Ensure
His Appearance in Court and the Safety of the Community**.

**A.      Overview of Governing Legal Principles**

Pursuant to the Bail Reform Act, 18 U.S.C. § 3141 *et seq*., the Court "shall order the
pretrial release of [a defendant] on personal recognizance, or upon execution of an unsecured
appearance bond . . . unless the [Court] determines that such release will not reasonably assure
the appearance of the person as required or will endanger the safety of any other person or the
community."  18 U.S.C. § 3142(b).

If the Court determines that release on personal recognizance or an unsecured bond poses
a risk of nonappearance or of danger to the community, the Court "shall order the release of the
person . . . subject to the least restrictive . . . condition, or combination of conditions, that . . . will
reasonably assure the appearance of the person as required and the safety of any other person and
the community . . . ."  18 U.S.C. § 3142(c)(1)(B).

Only if the Court finds that "no condition or combination of conditions will reasonably
assure the appearance of the person as required and the safety of any other person and the
community" shall the Court detain the defendant pending trial.  18 U.S.C. § 3142(e)(1).  A
finding that no conditions will reasonably assure "the safety of any other person and the
community" must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).
A finding that the defendant poses a risk of flight must be supported by a preponderance of the
evidence.  *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).  The burden of proof
rests with the government.

Because the Bail Reform Act favors pretrial release, "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citing *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)). Indeed, "[t]he wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985).

Moreover, if the Court deems it appropriate to release a defendant subject to certain conditions, those conditions need not guarantee the defendant's appearance but rather must simply "reasonably assure" the defendant's presence in Court. *Orta*, 760 F.2d at 891; *see also United States v. Madoff*, 586 F. Supp.2d 240, 249 (S.D.N.Y. 2009) (denying government application for detention based in part on finding that, while risk of flight could not be reduced to "zero," imposed conditions "substantially diminished" the risk).

As aptly stated in *Madoff*, the only issues before the Court in a bail application are whether the government can demonstrate that no condition or combination of conditions can reasonably assure a defendant's presence in court and the safety of the community:

> The issue at this stage of the criminal proceedings is not whether Madoff has been charged in perhaps the largest Ponzi scheme ever, nor whether Madoff's alleged actions should result in his widespread disapprobation by the public, nor even what is appropriate punishment after conviction. **The legal issue before the Court is whether the Government has carried its burden of demonstrating that no condition or combination of conditions can be set that will reasonably assure Madoff's appearance and protect the community from danger.** 18 U.S.C. § 3142(e).

*Madoff*, 586 F. Supp. 2d at 246 (footnote omitted).

Thus, a bail application presents a two-step inquiry—(1) the Court must determine whether the government has met its initial burden of demonstrating either a risk of flight or danger to the community, and (2) the Court must determine whether there are reasonable

conditions that can be imposed to allow the defendant to be released on bail, as Congress

indicated should be done in the vast majority of cases:

> Presented with a motion for detention, the Court undertakes a two-step inquiry. "First, the court must determine whether the Government has established 'by a preponderance of the evidence that [the defendant] . . . presents a risk of flight or obstruction of justice.'" *United States v. Khashoggi,* 717 F. Supp. 1048, 1049 (S.D.N.Y. 1989) (quoting *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988)) [(releasing on bail enormously wealthy defendant with few connections to the United States and vast resources overseas)]. If the Government carries this initial burden, the Court must determine whether there are reasonable conditions of release that can be set or whether detention is appropriate. *Friedman,* 837 F.2d at 49; *United States v. Berrios–Berrios,* 791 F.2d 246, 250 (2d Cir. 1986), *cert. dismissed,* 479 U.S. 978, 107 S. Ct. 562, 93 L. Ed. 2d 568 18 U.S.C. § 3142(e).

*Madoff*, 586 F. Supp. 2d at 247.

In deciding "whether there are conditions of release that will reasonably assure the

appearance of the person as required and the safety of any other person and the community," the

Bail Reform Act instructs the Court to consider "(1) the nature and circumstances of the offense

charged; (2) the weight of the evidence against the person; (3) the history and characteristics of

the person . . . ; and (4) the nature and seriousness of the danger to any person or the community

that would be posed by the person's release." 18 U.S.C. § 3142(g).

In addition, in certain circumstances, protracted pre-trial detention violates a defendant's

right to due process:

> To determine whether the length of pretrial detention has become unconstitutionally excessive, a court must weigh: (1) its length, (2) the extent of the prosecution's responsibility for delay of the trial, (3) the gravity of the charges, and (4) the strength of the evidence upon which detention was based, *i.e.,* the evidence of risk of flight and dangerousness. *See United States v. El-Gabrowny,* 35 F.3d 63, 65 (2d Cir. 1994).

*United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000).

We respectfully submit that the above-listed factors support our application for

Marmilev's release on bail pending trial.

6

**B.      The Nature and Circumstances of the Offense and the Weight of the Evidence Support Releasing Marmilev on Bail**.

In light of the nature and circumstances of the offense and the limited evidence against Marmilev, we submit that bail is appropriate.  In the long and complicated story of Liberty Reserve, Marmilev is but a minor character, perhaps meriting no more than a footnote.  The brainchild of two of Marmilev's co-defendants, LR was created to provide millions of people around the globe who are disenfranchised from mainstream financial channels a means to access goods and services via the internet through the use of online prepaid currency accounts.

At the outset we recognize that it is difficult for the Court to assess the government's case at such an early stage in the proceedings, which is why the weight of the evidence against a defendant has been deemed by some courts as the "least important" factor:

> The Court recognizes the difficulty inherent in assessing the Government's case before trial, and is mindful not to reach any conclusions about Fama's guilt or innocence.  Indeed, some courts have described the weight of the evidence factor as the "least important" of the § 3142(g) factors for these reasons.  *E.g.*, *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008); *United States v. Streater*, No. 97 Cr. 232, 1999 WL 1067837, at *6 (D. Conn. Nov. 5, 1999).

*United States v. Fama*, 13-CR-234 (JFK), 2013 WL 2467985, at *6 (S.D.N.Y. June 7, 2013).  Nevertheless, as demonstrated below, we submit that the available evidence weighs strongly in favor of releasing Marmilev on bail.

### 1.      Overview of the Rise and Decline of Liberty Reserve

Given our nation's dependence on credit and debit cards, it is difficult to fathom that millions of people around the world—honest, hardworking people—do not have credit cards or

even bank accounts.[1]  As such, they are unable to avail themselves of the benefits of the global digital economy in which we live.  Thus, LR was conceived as a competitor to PayPal in markets in which people do not have the requisite credit and banking infrastructure to enable them to utilize PayPal's services.

Having learned, however, from the example of predecessor businesses – in particular E-Gold – that the United States is hostile to virtual currencies, LR formed in Costa Rica because it intended to focus initially on servicing customers in South and Central America.  In contrast to the United States, Costa Rica was willing to work with LR to craft anti-money laundering guidelines and verification procedures to enable it to obtain an appropriate license—as discussed *infra*, regulations and guidance regarding virtual currency are only now beginning to be formulated in the United States.  Consequently, though the government casts the decision to form LR in Costa Rica as a sinister effort to "elud[e] law enforcement . . . ," Indictment at ¶ 12, as with many allegations in the Indictment, it is unsupported by evidence.

Indeed, in or about 2008, LR embarked on the process of obtaining a license from the Costa Rican agency known as the Superintendcia General de Entidades Financieras ("SUGEF").  As reflected in the discovery that the government has produced, LR dutifully engaged with SUGEF beginning in 2008 up until approximately November 2011 in the complex process required to obtain a license for its business.

As demonstrated *infra*, at the instruction of SUGEF, LR employed various anti-money laundering procedures in order to qualify for a license and to prevent criminal activity.

---

[1] Indeed, there are numerous people in the United States and even in New York who are unable to obtain bank accounts for a variety of benign reasons.  Exhibit A, "Bank Tool Is Expanding Unbanked Households, Regulators Say," New York Times, June 15, 2014 (reporting that "roughly 10 million households in the United States lack even a basic bank account" and that "more than 825,000 New Yorkers" do not have bank accounts).

Moreover, throughout the entirety of the licensing process in Costa Rica, the documents produced to us do not indicate that SUGEF ever suggested that it was dissatisfied with LR's efforts at compliance or that it deemed LR unsuitable to operate—indeed, SUGEF allowed LR to continue to operate throughout the licensing process.

Furthermore, LR's offices were in the same building complex as the SUGEF offices— plainly not the decision of a company seeking to evade regulation.  In addition, if, as the government contends, LR had in fact formed in Costa Rica to avoid licensing requirements, it would stand to reason that LR would have left Costa Rica as soon as it discovered that Costa Rica required LR to obtain a license and to implement anti-money laundering procedures.  To the contrary, however, LR complied with SUGEF's requirements throughout the three-year licensing process and SUGEF moved steadily forward toward granting LR a license.

The SUGEF licensing process screeched to a halt, however, on November 18, 2011, when the United States Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") secretly sent a notice to SUGEF stating that it had information that criminals were using LR to conduct illegal transactions.  Exhibit B, FinCEN Notice, dated November 18, 2011. Notably, though the FinCEN notice does not state that LR was complicit in the criminal nature of the alleged transactions, FinCEN chose not to disclose the notice to LR, which consequently deprived LR of the opportunity to work with the authorities to thwart criminal activity and potentially apprehend any such criminal users.[2]

Though the FinCEN notice did not provide any evidence to support the allegations that criminals were utilizing LR, the notice nonetheless effectively terminated LR's license

---

[2] FinCEN's decision in this regard is particularly remarkable because—as demonstrated below— LR voluntarily assisted law enforcement investigations on several occasions, including those conducted by the FBI.  It, therefore, appears plain that eliminating LR—not criminal activity— was the goal.

9

application process.  At that point, the evidence indicates that LR moved its computer servers to another country and began transferring its assets out of Costa Rica to avoid running afoul of the Costa Rican government, which had withdrawn its support for LR in response to U.S. intimidation.  Nonetheless, as reflected in the evidence that the government has provided, LR continued to employ anti-money laundering protocols even after it ceased operating in Costa Rica.

Plainly hostile to the ascendancy of virtual currency and intent on the elimination of LR, following LR's departure from Costa Rica, the United States pursued LR across the globe with efforts to seize its relocated servers and to shut down its operations.  Ultimately, those efforts were successful when, in May 2013, it unsealed the Indictment, arrested the defendants, and seized LR's assets worldwide, as well as the assets of LR's innocent customers.

Though the government succeeded in destroying a thriving business that provided a valuable service to its customers, its aim to cripple the virtual currency industry has failed as Bitcoin has emerged to fill the gap that the government created when it shuttered LR.  Ironically, in choosing to sacrifice the opportunity to work with LR—which, as discussed below, had a history of voluntarily complying with law enforcement requests for information—the government is now faced with the prospect of attempting to regulate the much more amorphous Bitcoin, which, unlike LR, is a decentralized system that is not controlled by any single entity or individual.

## 2.    The Charges Against Liberty Reserve Are Speculative and the Government's Case Is Weak.

A critical reading of the Indictment reveals that it is based largely upon speculation—indeed, it reads more like rhetorical propaganda than the legal charging instrument it is supposed to be.

The core of the government's charges is that LR intentionally avoided implementing anti-money laundering procedures known in the banking industry as "Know Your Customer" ("KYC").  Upon scrutiny, however, the evidence does not support this foundational allegation and the language in the Indictment reveals structural fissures in the government's case. Atypically, the Indictment contains numerous allegations that are couched with qualifying language that makes plain that the allegations are not based upon evidence but rather constitute inflammatory speculation.

For example, the government charges that "because *virtually* all of Liberty Reserve's business is derived from *suspected* criminal activity, the scope of the defendants' unlawful conduct is staggering."  Indictment at ¶ 10 (emphasis supplied).  Though at first blush this allegation appears ominous, upon closer examination, it is evident that it has no teeth.

The fact that the government "suspects" that LR's customers were engaged in criminal activity is meaningless from an evidentiary standpoint—indeed, this language amounts to surplusage that will likely be the subject of a future motion.  Moreover, the use of the word "virtually" is another signal that the government does not in fact have evidence but rather is painting with a broad brush in an effort to smear the image of LR.

Furthermore, the fact is that—as the BBC reported when the government closed LR—the company had many legitimate users that suffered substantial losses as a result of the closing of LR:

> They include Mitver Holdings, the firm behind a facility called ePay Cards.  This allows consumers outside the US to buy goods from stores in the country as if they owned a locally-issued Visa or MasterCard credit Card.
>
> The company – which has offices in London and Texas – used Liberty Reserve as a way for its customers to charge up their "virtual" credit cards.

11

Co-founder Mitchell Rossetti said he had about $28,000 sitting in his business's Liberty Reserve account at the time the site went offline.

"**We used Liberty Reserve because it was quick, efficient and secure**," he told the BBC.

"Now, we – and thousands of others who were dependent on it – have been left with nothing to look at except a blank webpage, and nothing more to go on than reports from the Costa Rican press."

Exhibit C, "Liberty Reserve Digital Money Service Forced Offline," BBC News, May 27, 2013. The BBC report also emphasizes that many LR customers "used the service for legitimate means, viewing it as a cheaper alternative to PayPal." *Id.* The BBC report is confirmed by the regular surveys that LR itself conducted, which indicate that LR's customers primarily used the service for such legitimate purposes as online shopping, sending money to family and friends, and bill payment. *See, e.g.,* Exhibit D, Liberty Reserve Survey at 2.

The government also charges that LR is "*[e]stimated* to have more than one million users worldwide, with more than 200,000 users in the United States." Indictment at ¶ 10 (emphasis supplied). As with the use of the words "virtually" and "suspects," the fact that the government bases its charges on an "estimated" number of users is indicative of the lack of evidentiary support for its claims. Tellingly, the government has declined to identify the evidence that proves that there were "200,000 users in the United States" and has similarly refused to identify any evidence that demonstrates that any users in the United States used LR for criminal transactions, or that LR or Marmilev had knowledge of any such purported criminal activity.

Based upon its *estimations* of *suspected* criminal activity, the government charges that LR is "*believed* to have laundered more than $6 billion in criminal proceeds." Indictment at ¶ 10 (emphasis supplied). It is, therefore, plain that the government has no idea whatsoever as to how

much—if any—money was laundered through LR.  The government's charges are admittedly based upon suspicion, speculation, and guesswork.

In addition, the Indictment also contains allegations that are demonstrably false.  For example, the government charges that LR "deliberately attracted and maintained a customer base of criminals by making financial activity on Liberty Reserve anonymous and untraceable." Indictment at ¶ 8.  The government cannot sustain this allegation.

First, the government has not pointed to any evidence that LR acted "deliberately" to attract "criminals."  In fact, LR attracted primarily merchants and online financial companies. Moreover, there are clear instances in which LR froze accounts that it detected were engaged in suspicious activity.  *See, e.g.*, Exhibit E, Email Correspondence Regarding Avo (LR froze Avo's account due to suspicious activity).  In addition, LR provided its customers with guidance as to how to avoid falling prey to fraud and other criminal schemes on the internet.  Exhibit F, LR Consumer Alert re: Avoiding Ponzi Schemes, Fraud, and Criminality.[3]

Second, the government is simply wrong in stating that financial activity on LR is "anonymous and untraceable."  While it is true that an LR customer could pay a fee to shield his account number from the person or entity with whom the customer was transacting business, the customer's identity was not shielded from LR itself and all transactions were recorded and, therefore, traceable.  Indeed, as discussed below, LR made such information available to law enforcement agencies on various occasions when it was requested—even in the absence of a subpoena or court order.

---

[3] In addition, as acknowledged by FinCEN and noted above, LR is not uniquely appealing to criminals. Criminals utilize PayPal, Bitcoin, and others.  The problem, therefore, is not the manner in which LR was designed.  As discussed below, the problem is the lack of a suitable regulatory system and a corresponding lack of technology capable of preventing criminals from misusing emerging financial systems.

Moreover, the government also paints an inaccurate picture with respect to LR's use of third-party money-exchangers.  Indictment at ¶ 16.  The government correctly explains that LR neither accepted direct deposits of currency from individual users nor allowed individual users to withdraw funds directly from their LR accounts.  Indictment at ¶ 16.  Instead, LR required users to deposit and withdraw funds from LR via third-party exchangers.  Indictment at ¶17.

There is, however, nothing illegal about utilizing third-party exchangers.  Indeed, as is common in many businesses, LR outsourced a labor-intensive component of its business to enable LR to focus on its core product – *i.e.*, an online payment service that provided users worldwide access to the global market place, which was otherwise beyond the grasp of its customers.

In fact, a recent FinCEN report acknowledges that there are frequently multiple links in the chain of a virtual currency transaction and that cooperation between the various financial entities is the best way in which to obtain comprehensive information about virtual currency transactions:

> Various financial institutions (FIs) including, but not limited to, **Virtual Currency Exchangers**, other Money Transmitters, other types of Money Services Businesses, and Depository Institutions may all be involved in the chain of transactions making up the lifecycle of a user's purchase, use and sale of Bitcoin for currency of legal tender.  This may include depository institutions that house the accounts of virtual currency users, administrators, and exchangers; additionally, depending on the transaction, correspondent banks may also be involved.  **Each institution has a unique vantage point from which to observe these transactions and identify suspicious activity**.  FinCEN encourages the use of information sharing under 314(b) in this context.  . . .

> **Virtual Currency Exchangers** (and other VC entities) **may have a unique view of the activities of their users and counterparties** as they enter and exit the virtual currency economy and conduct transactions within that economy.

Exhibit G, FinCEN SAR Stats Technical Bulletin, July 2014 at 15-16, (emphasis supplied).

Thus, there is nothing unusual or nefarious about utilizing third party exchangers.  In fact,

combined with the information that LR obtained from its customers, the "unique view" of the exchangers in actuality enriched the information potentially available to law enforcement.

Moreover, the evidence demonstrates that LR required its exchangers to comply with the financial regulations of the countries in which the exchangers operated and, to date, the government has declined to identify any evidence indicating that the exchangers failed to do so. Thus, the government's allegation that the "exchangers *tended* to be unlicensed money transmitting businesses operating without significant governmental oversight or regulation, concentrated in Malaysia, Russia, and Vietnam," Indictment at ¶ 18, appears to lack evidentiary support.

The operative inquiry is whether the exchangers complied with the laws of the countries in which they operated, and the government has not identified any evidence that they did not. Indeed, our review of the discovery indicates that LR required extensive documentation from its exchangers to ensure that they were in compliance. *See, e.g.*, Exhibit H, Compliance Application and Related Correspondence between Exchanger Exhere Limited and LR; *see also* Exhibit I, Exchanger Affiliation Agreement (requiring, among many other things, compliance with the laws of the country in which the exchanger is located, international law, and Costa Rican law); Exhibit J, Email from LR to Exchangers, dated February 24, 2011, requiring additional information or, in the alternative, informing exchangers that their accounts would be terminated.[4]

---

[4]   Note, Exhibit H is a small portion of the Exhere verification file provided in discovery.  The selected pages demonstrate by way of example that LR did not rubber stamp exchanger applications but rather required extensive documentation (including bank records, certified passports, and certificates of translation), insisted on notarized documents, made numerous follow-up requests for information, including additional information regarding verification procedures, and adjustments to the "Know Your Customer" section of the application.  Our review of the discovery makes clear that LR's approach to the verification process with Exhere was not unique but rather is indicative of the care with which LR approached each application. *See, e.g.,* Exhibit K, User Verification for Companies Document Checklist.

At bottom, the sum of the government's allegations amounts to the claim that criminals used LR—though the government has not yet identified with specificity a single criminal transaction—and, therefore, LR must have been aware that its service facilitated criminality.

Though the Indictment presents a superficially persuasive narrative, stripped of its innuendo, speculation, and estimation, it appears that it is unsupported by actual evidence. Moreover, unlike in many cases, in a case such as this one in which there is an inordinate amount of data, including customer accounts, computer databases, transaction histories, email communications from multiple parties, and wiretaps, the government's failure to identify with specificity the basis for its allegations belies the notion that it has a strong case.  In the end, the government's case is one that appears to amount to a claim that "where there is smoke, there must be fire."  The problem with this approach—apart from its logical failings—is that it appears that it is the government that is blowing the smoke.

> **3.     Substantial Evidence Exists Demonstrating that Liberty Reserve Implemented Anti-Money Laundering Protocols and Cooperated with Requests from Government Authorities Regarding Suspicious Activity.**

In addition to the general lack of evidence that customers used LR for criminal purposes—or even any evidence that LR was aware that its services were used for criminal purposes—there is also substantial evidence that LR implemented the very anti-money laundering procedures that the government claims it lacked (including verification procedures for exchangers and customers in the United States), and that LR voluntarily assisted law enforcement agencies on multiple occasions.

The following are among the steps that LR took to prevent its system from being used to launder money:

a.     LR developed internal policies, procedures, and controls.

16

b.     In accordance with instructions from SUGEF, LR implemented an alert system to identify individuals on the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC") list of Specially Designated Nationals ("SDN"):

> As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries.  It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.  Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs."  Their assets are blocked and U.S. persons are generally prohibited from dealing with them.

http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

c.     LR employed Silvia Lopez Saenz to serve as LR's compliance officer.  Ms. Saenz is highly qualified and has extensive experience.  Exhibit L, Resume of Silvia Lopez Saenz.[5]

d.     LR engaged an independent consultant to train its employees in procedures to detect and deter money laundering.

e.     LR had a user agreement and website disclaimer that set forth policies and procedures prohibiting the use of LR for criminal activity.  *See, e.g.*, Exhibit M, LR "Terms of Service" and "Anti-Money Laundering Policy."

In addition, as discussed above, LR had comprehensive requirements for companies seeking to serve as exchangers.  Exhibit K, User Verification for Companies Document

---

[5] Ms. Saenz's resume is in Spanish and we have not had an opportunity to translate it. Nevertheless, with even the most rudimentary understanding of Spanish, it is plain from her four-page resume that Ms. Saenz is highly qualified.

Checklist; Exhibit N, Know Your Customer Questionnaire.  Furthermore, LR froze numerous

accounts when it suspected that its customers were engaged in unlawful conduct.[6]

Moreover, with respect to customers in the United States, the discovery that we have

reviewed demonstrates that LR required that U.S. customers provide copies of their passports as

well as copies of utility bills and other documentation to verify their identities.  *See, e.g.*, Exhibit

O, Verification Documentation for Customers in the United States.

Additionally, LR restricted the accounts of its customers when suspicious activity was

detected and required additional verifications prior to reactivating such accounts.  Furthermore,

LR continued to implement anti-money laundering protocols even after Costa Rica terminated

the licensing process upon receipt of the November 18, 2011 FinCEN notice.

There is also evidence that when government entities sought LR's assistance in tracking

suspected criminal activity, LR readily provided information and willingly assisted in law

enforcement investigations.  *See, e.g.,* Exhibit P, Correspondence between LR and Law

Enforcement Agents (indicating that LR voluntarily provided extremely helpful assistance to law

enforcement upon request); *see also*, Exhibit Q, Letter from Sylvia Lopez Saenz, LR Compliance

Officer to FBI Special Agent Mark C. Ray, dated October 3, 2011 (providing requested

information regarding LR customer to FBI) (additional letters not included here were also sent to

S.A. Ray on October 5 and October 6, 2011); Exhibit R, Letter from Sylvia Lopez Saenz, LR

Compliance Officer, to Metropolitan Police Central Special Agent Frank Tutty, dated October

26, 2011 (providing requested information regarding LR customer to law enforcement).

---

[6] A detailed Excel spreadsheet highlighting numerous accounts that LR froze—upon suspicion
that a customer engaged in fraudulent activity or hacking, for example—is not amenable to
inclusion as an attachment but is available upon request.

In light of LR's compliance procedures, verification requirements, and voluntary assistance to law enforcement, we submit that the government's claim that LR was designed to facilitate to criminality rings hollow.

### 4. The Outcome in *United States v. E-Gold* Undercuts the Strength of the Government's Case.

Contrary to the government's view, the fact that E-Gold—a virtual currency provider that operated within the United States—was prosecuted for money laundering tends to demonstrate the weakness of the government's case. *See, e.g.,* Indictment at ¶ 11. In the E-Gold case, the government indicted the company and its owners for money laundering and operating an unlicensed money transmitting business.[7] Exhibit S, Indictment, *United States v. E-Gold*, 07-CR-109 (RMC) (D.D.C. April 3, 2008) ("E-Gold Indictment").

In the E-Gold Indictment, the government charged that $145,535,374.26 was laundered. Exhibit S, E-Gold Indictment at ¶ 48. Though a fraction of the amount that the government "estimates" was laundered via LR, the amount of money charged in the E-Gold Indictment is nonetheless substantial.[8] Nevertheless, despite the grandiose nature of the charges, the true strength of the government's case—or lack thereof—became apparent at the time of sentencing.

Notably, not a single defendant was sentenced to a period of incarceration. Indeed, with the exception of the owner and founder of E-Gold, who received six months home confinement, the defendants received suspended sentences without any period of confinement. Exhibit T,

---

[7] Unlike this case, however, E-Gold's employees—such as technical experts like Marmilev—were not indicted.

[8] Had the E-Gold Indictment based its allegations on extrapolations from daily volume as was done in this case, the amount alleged in the E-Gold Indictment would have dwarfed the amount alleged in the instant case.

*United States v. E-Gold*, Transcript of Proceedings, dated November 20, 2008, ("E-Gold

Sentencing"), at 24-25, 59, 116-17.

Moreover, though the Court issued non-Guidelines sentences, the highest sentence that

the government sought was 14 months incarceration, which was based upon an agreement that E-

Gold's owner was responsible for between $30,000-$40,000 in money laundering—a fraction of

the amount charged in the indictment.  Exhibit U, Plea Agreement of Douglas Jackson, dated

July 18, 2008, ("Jackson Plea Agreement") at 2; Exhibit U, E-Gold Sentencing at 109.

Thus, if E-Gold teaches anything, it is that indictments at times contain wildly

exaggerated claims that prosecutors ultimately abandon in favor of dispositions that more

accurately reflect the evidence.

Furthermore, as part of the resolution of the E-Gold case, E-Gold, which was permitted to

continue its operations, was required to implement various anti-money laundering protocols.

Exhibit U, Jackson Plea Agreement at 6-9.  As discussed above, LR implemented many of the

same anti-money laundering protocols as part of the licensing process with SUGEF.  Thus,

contrary to the government's claim that LR's knowledge of the E-Gold prosecution evidences its

criminal intentions, LR attempted to use the lessons of E-Gold to develop a system that would

avoid the pitfalls of E-Gold.

### 5.     Marmilev Had a Limited Role in Liberty Reserve.

As noted above, the government charges that, as an employee of LR, Marmilev engaged

in money laundering and operating an unlicensed money transmitting business.  The evidence

against Marmilev is weak on both fronts.

Marmilev had no responsibility for licensing or other compliance issues with respect to

LR.  Indeed, as noted above, by the government's reckoning, Marmilev was "principally

20

responsible for designing and maintaining Liberty Reserve's technological infrastructure." Indictment at ¶ 7.  Indeed, Marmilev worked in Brooklyn and not in Costa Rica and had limited contact with LR's offices.  He primarily communicated with programmers and other individuals responsible for technical matters.  Moreover, there is no evidence that Marmilev was specifically aware of any licensing requirements or any laws regarding such matters.

Consequently, even assuming *arguendo* that the government can prove the allegations in the Indictment with respect to LR, the evidence thus far disclosed does not demonstrate that Marmilev engaged in the charged criminal activity.  Moreover, as noted above, it is doubtful that the government can sustain its burden even with respect to LR as a whole.

Accordingly, in light of Marmilev's limited role in LR, we submit that the government must do more than offer speculation and estimation to support its allegations that Marmilev is responsible for the massive criminality alleged in the indictment.  As it stands now, the government's approach with respect to Marmilev appears to amount to little more than an inference of guilt by association.  The problem with that approach, however, is that apart from a lack of any evidence linking Marmilev to criminality, it appears that the government has little direct evidence that LR was engaged in criminality.

### 6.   Regulations for Virtual Currencies Did Not Exist When LR Was Formed and Are Only Now Being Formulated.

Apart from the lack of evidence that LR engaged in the crimes charged, to a certain degree, the government is putting the cart before the horse because there has long been widespread confusion as to the applicability of existing regulations to virtual currencies. Moreover, the confusion is far from unfounded due to the lack of guidance from financial regulatory authorities at both the state and federal levels.

Indeed, it is only now, eight years after LR was formed, that government officials in this country are beginning to recognize the need to enact regulations applicable to virtual currencies. Thus, given that regulations for virtual currencies are just now being discussed, it is unclear whether in 2006 LR could have obtained a license in the U.S. even if it had sought to do so.

For example, after conducting a six-month investigation in 2013, the New York State Department of Financial Services commenced hearings in January 2014 at which it heard testimony from law enforcement officials, financial industry experts, and individuals involved in virtual currency businesses in an effort to develop proposed regulations for virtual currency firms operating in New York:

> [O]ver the last six months, our agency has been conducting an extensive inquiry into virtual currencies.
>
> We've had dozens and dozens of meetings with a range of industry participants.
>
> We've spoken to leading academics and law enforcement officials.  And we've reviewed thousands of pages of documents, reports, and other materials.
>
> Today's public hearing is the next step in that inquiry.
>
> Ultimately, it's our expectation that **the information we've gathered in this fact-finding effort will allow us to put forward, during the course of 2014, a proposed regulatory framework for virtual currency firms operating in New York**.
>
> **I believe that we would be the first state in the nation to do so.  Clearly when it comes to virtual currencies, regulators are in new and unchartered waters**.

Exhibit V, Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, Hearings on the Regulation of Virtual Currency, dated January 28, 2014.

Superintendent Lawsky's remarks are telling.  The fact that New York is the first state in the nation that has even begun a process that will enable it to propose regulations for virtual

currencies is indicative of the nascent stages of this industry and general lack of knowledge about how it should be managed among all involved.[9]

Moreover, federal financial regulators are similarly behind the curve in terms of providing guidance to those involved with virtual currency. Indeed, it was not until March 18, 2013—just two months prior to the Indictment—that FinCEN issued guidance regarding the "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies." Exhibit W, Department of Treasury, FinCEN Guidance Memorandum, dated March 18, 2013 ("FinCEN Guidance").[10]

Specifically, the FinCEN Guidance explains "Currency vs. Virtual Currency," provides definitions of users, exchangers, and administrators of virtual currencies, and clarifies the applicability of FinCEN regulations promulgated under the Banking Secrecy Act to the various parties involved in a virtual currency transaction. Exhibit W, FinCEN Guidance. The fact that FinCEN determined it necessary to issue such basic guidance in March 2013 indicates the substantial confusion in the industry that existed prior to that point.

Therefore, in light of the lack of a regulatory framework governing virtual currencies, it strains credulity to suggest that LR intentionally avoided complying with non-existent

---

[9] The lack of state licensing requirements for virtual currencies raises two related issues. First, in the absence of a state licensing requirement, LR cannot have violated the unlicensed money transmitting business statute because that statute is predicated upon the failure to obtain a required state license. Second, many states do not require licenses for any form of money transmitting business. Thus, with regard to the potential penalties that Marmilev faces under the licensing statute, any Guidelines calculation would necessarily be limited to those transactions that occurred in states in which LR operated without a required license, which is surely a fraction of the grossly exaggerated amounts alleged in the Indictment.

[10] Prior to the FinCEN Guidance, it was not clear that LR qualified as a virtual currency—as opposed to a prepaid access service (i.e., a digital wallet), which does not require a license. *See* Exhibit W, FinCEN Guidance.

regulations, particularly in light of the fact that it did comply with Costa Rican regulations during the almost four-year licensing process in which it engaged with SUGEF.

Thus, we submit that the lack of applicable regulations also tips the scale in favor of releasing Marmilev on bail.

**C.    Marmilev's History and Characteristics Support His Release on Bail**.

Marmilev is 35 years old.  He has no criminal record.  Born in Ukraine and raised in Israel, where he is a citizen, Marmilev came to the United States legally in 2003 on a student visa and later achieved permanent resident alien status.  Marmilev attended Brooklyn college for four years, maintaining a 3.9 grade-point average with a major in computer science and a minor in business administration.

Prior to his arrest, he lived in a modest apartment in Brooklyn with his wife.  In addition to his wife, his maternal aunt, Yanina Izraitel, with whom Marmilev has an exceptionally close relationship also lives nearby in Brooklyn.  While Marmilev is not a citizen, he has strong connections to this country given the presence of his wife and aunt, and his connection to the local Jewish community.

Moreover, the available evidence indicates that he is not a risk of flight.  As noted above, in November 2011, FinCEN notified Costa Rican officials that the U.S. suspected that LR was engaged in money laundering, which prompted Costa Rican authorities to force LR to shut its offices and relocate its servers in the Netherlands.   Thereafter, in January 2012, upon returning to the United States from a trip to Costa Rica, the authorities detained Marmilev at JFK airport for four hours during which time they seized and searched his personal belongings, including all

electronic devices—including his laptop computer, which they retained for several days. Notably, Marmilev voluntarily provided the password to access his computer.[11]

Despite these events, Marmilev continued to reside with his wife in their Brooklyn apartment until the day of his arrest and made no effort to leave the United States.

Moreover, the fact that Marmilev is not a United States citizen does not alone render him unsuitable for release on bail.  In *Khashoggi*, 717 F. Supp. 1048, an enormously wealthy citizen of Saudi Arabia—who had remained a fugitive for six months prior to his arrest in Switzerland and, thereafter, contested extradition—was granted bail.  *Id*. at 1052.

In *Khashoggi*, the Court acknowledged the defendant's enormous wealth, the fact the defendant's ties to this country were primarily financial, and the fact that—prior to his arraignment—the defendant had not been in the United States for three years.  *Khashoggi*, 717 F. Supp. at 1049-51.  Nonetheless, the Court determined that there were conditions that could reasonably assure the defendant's presence in Court.

By contrast, though Marmilev is also not a citizen of the United States, prior to his arrest he lived in New York and despite clear indications that the government was investigating LR (including his detention at the airport and the seizure of his computer), he did not become a fugitive; he remained in Brooklyn until the day of his arrest.  In addition, he does not have enormous financial resources to enable him to leave the jurisdiction and live abroad.  Moreover, upon surrendering his passport, it would be virtually impossible for him to enter Israel where he is a citizen given Israel's near impenetrable border security.

---

[11] Though at the time Marmilev was told that it was officers from the department of Homeland Security that had detained him, in fact it was the FBI that detained him and searched his computer and other belongings for evidence in the instant prosecution.  The government thereby circumvented the warrant requirement in gaining access to Marmilev's computer.

Consequently, we submit that there are conditions that can *reasonably assure* Marmilev's presence in Court.  *Madoff*, 586 F. Supp. 2d at 249 (denying government application for detention based in part on finding that, while risk of flight could not be reduced to "zero," imposed conditions "substantially diminished" the risk).

**D.      Marmilev Can Post Adequate Security to Ensure His Presence in Court and the Safety of the Community**.

It is our understanding that the government's opposition to Marmilev's release on bails is premised on a claim that he is a risk of flight and not that he represents a danger to the community.  Marmilev is prepared to post a Seven Hundred and Fifty Thousand Dollar ($750,000) bond secured by real property valued at Four Hundred and Forty Thousand Dollars ($440,000) and currency in the amount of One Hundred Thousand Dollars ($100,000).

The proposed bail package provides considerable financial incentive and tremendous moral suasion to ensure Marmilev's appearance in court and the safety of the community.  The assets that we are prepared to post consist of the following:

| Address | Owner | Equity |
|---|---|---|
| 2600 East 21st St. #7B Brooklyn, NY 11235 | Yanina Izraitel | $190,000 |
| 2600 East 21st St. #5H Brooklyn, NY 11235 | Akady Solodukho | $120,000 |
| 1680 Ocean Ave. #1L Brooklyn, NY 11230 | Inna Gankina | $130,000 |
| Bank Account Funds | Gennadiy Shapiro | $100,000 |
| **Total Equity:** | | $540,000 |

In addition to the owners of the property listed above, two additional people are also prepared to sign the bond, Marmilev's wife and Iren Shemelyak (a close friend of Marmilev). Given the number of people prepared to step forward on Marmilev's behalf, all of whom would

be rendered homeless if he violates the conditions of his release, there is tremendous financial and moral suasion to ensure Marmilev's appearance in court and the safety of the community.

**E.      Due Process Supports Marmilev's Release on Bail.**

To the extent that the Court has any residual doubts as to whether to release Marmilev on bail, we submit that due process considerations further support his application for release.

Marmilev has been in custody for over one year to date.  Trial is not scheduled to begin until April 27, 2015.  Thus, if Marmilev remains in custody until trial, he will spend two years in jail based upon an indictment alone.  We submit that such protracted pre-trial detention would violate Marmilev's right to due process:

> To determine whether the length of pretrial detention has become unconstitutionally excessive, a court must weigh: (1) its length, (2) the extent of the prosecution's responsibility for delay of the trial, (3) the gravity of the charges, and (4) the strength of the evidence upon which detention was based, *i.e.,* the evidence of risk of flight and dangerousness. *See United States v. El-Gabrowny,* 35 F.3d 63, 65 (2d Cir. 1994).

*El-Hage*, 213 F.3d at 79.

First, the potential length of Marmilev's pretrial incarceration weighs in favor of his release.  "Although the flexible standards of due process preclude fixing an unconstitutional period of pretrial detention with certainty, the Second Circuit has observed that 'grave due process concerns' are implicated by a seven month period of pretrial detention." *Khashoggi*, 717 F. Supp. at 1051 (quoting *United States v. Jackson,* 823 F.2d 4, 7 (2d Cir. 1987)).  Here, Marmilev has already been incarcerated for more than a year and absent bail will remain incarcerated for nearly another year—and, perhaps, longer.

Second, though we do not suggest that the prosecution has intentionally delayed the trial, the reasons for the lengthy pretrial period have far more to do with matters within the

government's control than Marmilev's control.  For example, though Marmilev was arrested in May 2013, the vast majority of the discovery did not become available to us until March 2014.

Thus, in the absence of discovery, Marmilev was unable to prepare for trial.  Moreover, in view of the volume of discovery that the government has produced—a great deal of which is irrelevant but must nonetheless be reviewed—Marmilev could not reasonably be expected to be ready for trial much before the scheduled date.  Had the government been in a position to produce all or most of the discovery at or around the time of Marmilev's arrest, Marmilev would undoubtedly have sought to proceed to trial more expeditiously.

It bears noting that the government has produced approximately 32 terabytes of discovery—which is, to our knowledge, unprecedented in a criminal prosecution.  To put this volume of material in perspective, a single gigabyte of printed material is enough to fill the bed of an average size pickup truck.  The government, therefore, has produced the rough equivalent of 32,000 truckloads of documents.

Third, though we recognize that the charge of money laundering is serious, and we do not attempt to minimize it, we submit that the gravity of the offense charged here weighs in Marmilev's favor or is perhaps a neutral factor.  Indeed, defendants charged with financial crimes are routinely released on bail.  *See, e.g., Madoff*, 586 F. Supp. 2d 240; *United States v. Bodmer*, 03-CR-947 (SAS), 2004 WL 169790 (January 28, 2004) (granting bail to Swiss national charged with money laundering).

The fourth factor—the strength of the evidence upon which detention is based—is not directly relevant in this case because Marmilev has not previously sought bail.  As discussed in detail above, however, we submit that even absent due process considerations, bail is

warranted.[12]   Accordingly, in our view, the due process concerns serve only to strengthen

Marmilev's bail application.

Moreover, Marmilev's ability to assist in his defense is severely hampered due to his

incarceration.  Marmilev is uniquely qualified to assist in his defense because (a) the nature of

the discovery in this case is highly complex technical data that requires particular expertise to

analyze, and (b) the immense volume of discovery requires a high level of technical skill to

review efficiently.  Accordingly, Marmilev's ability to assist in his defense is another factor that

weighs in favor of his release on bail:

> Bodmer faces serious criminal charges, and pretrial detention may "hinder [ ] his
> ability to gather evidence, contact witnesses, or otherwise prepare for his
> defense." *Barker v. Wingo,* 407 U.S. 514, 533, 92 S. Ct. 2182, 33 L. Ed.2d 101
> (1972).  Because of the nature of the charges, the Government expects discovery
> to be voluminous.  *See* Transcript of 1/21/04 arraignment.  It will be far easier for
> Bodmer to assist his counsel in reviewing and responding to discovery if counsel
> has regular, uninterrupted access to him.  Moreover, Bodmer will undoubtedly be
> crucial to his lawyers' understanding of the complicated financial transactions that
> are the subject of the indictment.

*United States v. Bodmer*, 03-CR-947 (SAS), 2004 WL 169790 (S.D.N.Y. Jan. 28, 2004).

In the instant case, the volume of discovery is astounding, the technical skill and

knowledge required simply to open many of the computer files is staggering, and the ability to

utilize sophisticated software to analyze the data is beyond the comprehension of the average

individual.  Consequently, Marmilev is uniquely qualified to aid counsel in preparation for trial

and his incarceration severely impairs his ability to do so.

Though the government has attempted to accommodate Marmilev's needs with respect to

discovery while incarcerated, Marmilev has nonetheless been severely limited in his ability to

analyze the discovery due to (1) the inferior equipment that has been made available to him, (2)

---

[12] The decision regarding the timing of this application was based upon a number of factors that
are not appropriate for inclusion here.

the limited access that he has to that equipment, and (3) his inability to access the internet, which is crucial to identifying software necessary to access and analyze the monumental volume of discovery in this case.[13]  In addition, millions of pages of the discovery are in Spanish and require translation before they can be meaningfully reviewed.

With his technical expertise, Marmilev is particularly qualified to assist counsel in his defense because—with the appropriate resources—he is capable of constructing efficient search mechanisms that can filter the data in a matter of months rather than the years that would otherwise be required for its complete review.  Consequently, given the unique circumstances of this case, we submit that Marmilev's ability to assist in his own defense is dependent upon his release on bail.

Accordingly, based upon the factors discussed above, we submit that due process requires Marmilev's release on bail.

---

[13] We note that the government is in the process of attempting to provide Marmilev with access to more sophisticated computer equipment but there are logistical hurdles to doing so and—even if such equipment becomes available—without access to the internet, Marmilev's ability to analyze the discovery will remain extremely limited.

## <u>Conclusion</u>

For all of the foregoing reasons, we respectfully request that the Court order Marmilev's

release on bail pending trial.

Dated: New York, New York
            August 19, 2014

                                        Respectfully submitted,

                                        s/SETH GINSBERG
                                        Attorney at Law
                                        299 Broadway, Suite 1405
                                        New York, New York 10007
                                        212-537-9202
                                        srginsberg@mac.com

                                        *Attorney for Mark Marmilev*