**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
**UNITED STATES OF AMERICA,**

    **- against -**                        **13-CR-368 (DLC)**

**MARK MARMILEV, *et al.*,**

                 **Defendants.**
--------------------------------------------------------x

<u>**SENTENCING MEMORANDUM ON BEHALF OF MARK MARMILEV**</u>

**SETH GINSBERG**
**Attorney at Law**
**299 Broadway, Suite 1405**
**New York, New York 10007**
**212-537-9202**
**srginsberg@mac.com**

***Attorney for Mark Marmilev***

## **Table of Contents**

Introduction...................................................................................................................... 1

The Sentencing Guidelines ................................................................................................ 3

Discussion .......................................................................................................................... 4

The Factors Under 18 U.S.C. § 3553(a) Warrant a Non-Guidelines Sentence. ............................ 4

    A.   Overview of Governing Legal Principles ....................................................................... 5

    B.   The Nature and Circumstances of the Offense Warrant a Non-Guidelines Sentence....... 8

         1.   The Offense of Conviction is Primarily a Licensing Violation and the Guidelines, therefore, Overstate the Seriousness of the Offense. .................................................. 8

         2.   Liberty Reserve Was Designed to Provide the Disenfranchised Access to the Global Economy—Not to Attract Criminals. .......................................................... 16

         3.   Liberty Reserve Was Compliant with Costa Rican Licensing Requirements. .......... 27

         4.   Marmilev's Role in Liberty Reserve.................................................................... 34

    C.   Marmilev's History and Characteristics Support a Non-Guidelines Sentence. .............. 42

    D.   A Non-Guidelines Sentence Will Avoid Unwarranted Sentence Disparities. ................ 43

    E.   Additional Factors Under § 3553(a) Support a Non-Guidelines Sentence. ................... 46

Conclusion ........................................................................................................................ 48

**Introduction**

On May 24, 2013, the Government arrested Mark Marmilev based upon charges stemming from his employment with Liberty Reserve ("LR")—a web-based prepaid currency service—that was a pioneer on the frontier of the digital financial industry that had made substantial inroads developing a secure and efficient means of conducting financial transactions on the internet. Far from the criminal organization the Government depicts, with approximately 50 employees, including financial, legal, and technical professionals, LR was poised to be a dominant force in the world of online financial transactions.

Nonetheless, as a result of his involvement with LR, the Government charged Marmilev with conspiracy to commit money laundering, conspiracy to operate an unlicensed money transmitting business, and operation of an unlicensed money transmitting business. Indictment, 13-CR-368 (DLC) (the "Indictment"). The Indictment alleges that LR engaged in financial transactions valued at several billion dollars and the charges in the Indictment carry a potential of 30 years imprisonment.

On September 11, 2014, however, Marmilev entered a plea of guilty to a single count of conspiring to operate an unlicensed money transmitting business—essentially a regulatory compliance offense—as defined in 18 U.S.C. § 1960(b)(1), in violation of 18 U.S.C. § 371, which carries a maximum penalty of 60 months imprisonment. Plea Agreement at 2-3. We note that, though his plea came more than a year after indictment, Marmilev readily communicated to the Government his desire to accept responsibility for his conduct, and the gap between indictment and plea was due to matters wholly unrelated to Marmilev.

Thus, on December 12, 2014, Marmilev—a 35-year-old man with no criminal record— will appear before your Honor to be sentenced for the single offense of which he stands

convicted.  For the reasons summarized below and set forth in detail in the sections that follow, we respectfully submit that a sentence below the 60-month maximum penalty is appropriate in this case:

(a)     The Guidelines applicable to the offense of conviction overstate the severity of Marmilev's conduct because they were designed to apply to offenses of a distinctly different nature—namely, fraud and theft offenses as opposed to the strict liability regulatory compliance offense that is the driving force in the Guidelines calculation here.

(b)     The applicability to LR of the regulations at issue was murky at best until two months before the Indictment when the Treasury Department issued guidance to eliminate growing confusion in the virtual currency industry.  Consideration of the uncertainty regarding the operative regulations is, therefore, warranted under the rule of lenity.

(c)     Despite its failure to register with U.S. authorities, LR was authorized to operate in Costa Rica—where it was located—and it employed anti-money laundering procedures that are virtually identical to those required in the U.S.

(d)     As the person responsible for the technical aspects of LR, Marmilev was largely unaware of regulatory compliance issues.  Thus, though he is nonetheless liable for the offense, we submit that his role in LR is a mitigating factor.

(e)     The need to avoid unwarranted sentencing disparities weighs in favor of a sentence below the statutory maximum.  Courts have routinely recognized that the Guidelines yield unreasonably high sentences in § 1960 prosecutions.  Moreover,

there is growing recognition that, with respect to economic offenses in general, the Guidelines frequently result in unduly harsh sentences.

(f)    As a person subject to deportation, who has already been imprisoned for nearly 19 months in the harsh confines of the MCC, whatever penalty the Court imposes will be amplified by Marmilev's immigration status.

Accordingly, for the above-listed reasons, together with the additional issues raised below, we respectfully submit that a 60-month sentence would be far greater than necessary to achieve the goals set forth in 18 U.S.C. § 3553(a).

## The Sentencing Guidelines

As noted, on September 11, 2014, Marmilev pled guilty to a single count of conspiracy to operate an unlicensed money transmitting business.  Plea Agreement at 1.  As also noted, Marmilev readily communicated to the Government his desire to accept responsibility for his conduct and did so at the first opportunity provided.  As a result, Marmilev spared the Government the need to engage in motion practice, which would have been considerable, and obviated the need for a lengthy and complicated trial in a matter that not only involves considerable legal issues but the greatest quantity of discovery ever produced in a criminal case in this District—some 32 terabytes of data, which if printed would amount to several thousand truckloads of documents.

The parties calculated the applicable offense level under the United States Sentencing Guidelines as 33, which, for Marmilev, who is in Criminal History Category I, carries a corresponding advisory range of imprisonment of 135-168 months.  Plea Agreement at 2. Because, however, the parties determined that a plea to a violation of § 371 is appropriate, the

3

statutory maximum penalty of 60-months incarceration is the effective advisory Guidelines sentence.  Plea Agreement at 2-3.

The parties calculated the Guidelines offense level as follows: **(a)** base offense level 34 due to estimated value of financial transactions in offense being greater than $200 Million but less than $400 Million, U.S.S.G. § 2S1.3(a)(2); **(b)** increase of two levels because Marmilev consciously avoided confirming his suspicion that a high probability existed that a portion of the financial transactions involved funds derived from unlawful activity, U.S.S.G. § 2S1.3(b)(1)(A); and **(c)** three-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1.  Plea Agreement at 2.

The Probation Department also calculates Marmilev's Offense Level at 33.  Presentence Report, dated November 5, 2014, ("PSR") at ¶¶ 90-99.  Despite calculating the same offense level, Probation found U.S.S.G. § 2X1.1(a) applicable.  We agree with Probation that § 2X1.1(a) is applicable, but—as Probation concluded—the calculation remains the same.

The parties—and Probation—agree that neither a downward nor an upward departure from the Guidelines is warranted.  The parties further agree that Marmilev may seek a non-Guidelines sentence based upon the factors set forth in 18 U.S.C. § 3553(a).  Plea Agreement at 3.

To avoid repetition, the details of the offense conduct are discussed *infra* in the section the "Nature and Circumstances of the Offense."

## Discussion

## The Factors Under 18 U.S.C. § 3553(a) Warrant a Non-Guidelines Sentence.

We respectfully submit that a sentence below the effective advisory Guidelines sentence of 60 months imprisonment would be sufficient but not greater than necessary to achieve the

sentencing goals articulated in 18 U.S.C. § 3553(a).

**A.      Overview of Governing Legal Principles**

It is well settled that the Guidelines are advisory and serve simply as the starting point or initial benchmark for the Court. *United States v. Booker*, 543 U.S. 220 (2005). In addition to the Guidelines, the Court must also consider the factors enumerated in 18 U.S.C. § 3553(a):

The Court shall impose a sentence sufficient, but not greater than necessary . . . [and] shall consider—

1.      The nature and circumstances of the offense and the history and characteristics of the defendant;

2.      The need for the sentence imposed—

    a.      To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b.      To afford adequate deterrence to criminal conduct;

    c.      To protect the public from further crimes of the defendant;

    d.      To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.      The kinds of sentences available;

4.      The kinds of sentence and the sentencing range established . . . [by the Sentencing Guidelines];

5.      Any pertinent policy statement . . .

6.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.      The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (some minor alterations not noted).

Though the Guidelines are an important factor in the sentencing analysis, they are only advisory and the Court is generally free to impose a non-Guidelines sentence. *Gall v. United*

*States*, 128 S. Ct. 586 (2007); *Booker*, 543 U.S. 220.  "The sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, *i.e.,* a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence."  *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005); *see also United States v. Castillo*, 460 F.3d 337, 352 (2d Cir. 2006).

In *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*), the Second Circuit eliminated all doubt as to the degree of discretion that district courts have in making sentencing determinations: "A sentencing judge has *very wide latitude* to decide the proper degree of punishment for an individual offender and a particular crime."  *Cavera*, 550 F.3d at 188 (emphasis supplied).  The *Cavera* Court elaborated as to the proper role of the Guidelines in the sentencing calculus and a district court's concomitant authority to issue a non-Guidelines sentence:

> The Guidelines provide the "**starting point and the initial benchmark**" for sentencing, *Gall,* 128 S. Ct. at 596, and district courts must "remain cognizant of them throughout the sentencing process," *id.* at 596 n. 6.  **It is now, however, emphatically clear that the Guidelines are guidelines—that is, they are truly advisory**.  **A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense**.  **District judges are, as a result, generally free to impose sentences outside the recommended range**.  When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id.* at 597.  **In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing**.  18 U.S.C. § 3553(a).

*Cavera*, 550 F.3d at 189 (emphasis added) (footnotes omitted).

The Supreme Court confirmed *Cavera*'s approach in *Nelson v. United States*, 129 S. Ct. 890 (2009), and *Spears v. United States*, 129 S. Ct. 840 (2009).  In *Nelson*, the Court instructed

as follows:

> [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. Instead, the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter.

*Nelson*, 129 S. Ct. at 891-92 (internal citations omitted).  Thus, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."  *Nelson*, 129 S. Ct. at 892 (emphasis in original).

In *Cavera*, the Court of Appeals made clear that it would "not substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case."  *Cavera*, 550 F.3d at 189.  The Court emphasized that it would not second guess the determinations of the district court: "To the extent that our prior cases may be read to imply a more searching form of substantive review, we today depart from that understanding."  *Cavera* 550 F.3d at 189.

The Second Circuit has also explained that "'reasonableness' is inherently a concept of flexible meaning, generally lacking precise boundaries."  *United States v. Verkhoglyad*, 516 F.3d 122, 134 (2d Cir. 2008) (quoting *United States v. Crosby,* 397 F.3d at 115).  It further recognizes that a range of sentences can appropriately be deemed reasonable in any particular case.  *United States v. Patterson*, 538 Fed. App'x 62, 63 (2d Cir. 2013) (citing *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008)).

In addition, the Court can exercise wide discretion in the sources and types of evidence it utilizes to determine the kind and extent of punishment to be imposed within limits fixed by law, including, in particular, the fullest information possible concerning a defendant's life and characteristics.  *Pepper v. United States*, 131 S. Ct. 1229 (2011).

7

Further, in determining whether a particular factor warrants a downward variance from the Guidelines, a Court need not find that it constitutes an extraordinary circumstance. *Gall*, 128 S. Ct. at 595 (holding that variance from the Guidelines does not require extraordinary circumstances).

**B.     The Nature and Circumstances of the Offense Warrant a Non-Guidelines Sentence.**

We respectfully submit that a sentence below the effective Guidelines sentence would be sufficient but not greater than necessary in light of the nature and circumstances of the offense.

**1.     The Offense of Conviction is Primarily a Licensing Violation and the Guidelines, therefore, Overstate the Seriousness of the Offense.**

Marmilev pled guilty to conspiring to operate an unlicensed money transmitting business in violation of 18 U.S.C § 1960(b)(1)(B) and (b)(1)(C), which involve a failure to register with the Treasury Department and knowledge that a portion of the proceeds of the business were derived from unlawful activity, respectively.  Specifically, Marmilev articulated his responsibility as follows:

> From in or about 2006 until in or about May 2013, I knowingly agreed with others to conduct the business of Liberty Reserve in my capacity as the person responsible for technical aspects of the company, which was a business that was engaged in the transfer of funds on behalf of the public, including transfers from places within the United States to places abroad.
>
> As a money transmitting business that did substantial business with customers in the United States, Liberty Reserve was required to register with the U.S. Secretary of the Treasury, which I knew had not been done.  I now understand that the failure to register violates 18 U.S. Code 1960(b)(1)(B).
>
> In addition, I understand that I violated 18 U.S.C. 1960(b)(1)(C) because I believed that a substantial amount of funds from the United States moving through Liberty Reserve came from high yield investment programs that I believed had a high probability of being fraudulent but I consciously avoided obtaining confirmation.

Transcript of Proceedings, dated September 11, 2014, ("Plea Tr.") at 13-14.

**The Failure to Register**

The failure to register the business with the Secretary of the Treasury is a strict liability offense. Although Marmilev was aware that LR was not registered in the United States, as the person responsible for the technical aspects of LR, he was not aware that LR was required to register in United States because LR was registered and authorized to operate in Costa Rica. In fact, as discussed below, others within LR were specifically tasked with responsibility for licensing and other compliance issues. Thus, as far as Marmilev was aware, the fact that LR was registered and authorized to operate in Costa Rica was sufficient. We recognize, however, that because the failure to register is a strict liability offense, Marmilev is nonetheless liable.

Marmilev's Guidelines Offense Level is derived almost entirely from this aspect of the offense. The parties agree that a reasonable estimate of the amount of funds applicable to the offense is Two Hundred Million Nine Hundred Thousand Dollars ($209,000,000), which represents the amount of money that was transferred either from LR to customers in the United States or from customers in the United States to LR—in each instance through an intermediary exchanger, which received funds via U.S. bank wires or Western Union (that are subject to, and employ, U.S. anti-money laundering and currency reporting requirements). Plea Agreement at 2, PSR ¶¶ 30, 33.

Consequently, Marmilev's base offense level is increased 28 levels from six to 34, due solely to the value of the funds transferred between LR and U.S. customers without regard to whether the funds were derived from lawful or unlawful conduct. U.S.S.G. § 2S1.3(a)(2), cmt. n.1 ("whether the funds were lawfully or unlawfully obtained" is irrelevant when calculating the "value of funds").

While we acknowledge the applicability of U.S.S.G. § 2S1.3, its incorporation of the loss table in § 2B1.1 yields a result in this case that is difficult to square with traditional notions of justice. Though applied to a variety of offenses, § 2B1.1 is designed principally for fraud and theft offenses. Yet, in the instant matter, Marmilev received a 28-level increase based solely on the quantity of the funds transmitted. Consequently, the Guidelines advise that Marmilev receive a sentence in the same range as an offender who steals, defrauds, or willfully structures transactions involving funds exceeding $200 Million. Such a sentence is incongruous for someone convicted under strict liability licensing statute.[1]

In *United States v. Keleta*, 552 F.3d 861 (D.C. Cir. 2009), in his dissenting opinion, Senior Circuit Judge Williams persuasively explains why application of the loss table does not makes sense in § 1960 cases:

> Section 2S1.3(a)(2) states that the base offense level for a variety of crimes, including the offenses of conviction here (18 U.S.C. § 1960), shall be "6 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the funds." Application Note 1 defines the term "value of the funds" as "the amount of the funds involved in the *structuring or reporting conduct.*" § 2S1.3 application n. 1 (emphasis added). The conduct for which Keleta was convicted—managing an "unlicensed money transmitting business"—involves neither "structuring" nor "reporting." Those offenses are covered by other statutes to which § 2S1.3 applies. *See, e.g.*, 31 U.S.C. §§ 5313 (reporting), 5324 (structuring). Keleta, however, was not charged with, much less convicted of, failing to report financial transactions or structuring transactions to evade reporting requirements. As the term is properly understood, therefore, the "value of the funds" involved in his offense is zero, with a resulting base offense level of 6 and an advisory sentencing range of zero to six months (much lower than the 63-78-month range corresponding to offense level 26 or even Keleta's actual sentence of 31 months).

---

[1] We are aware that Marmilev's plea also involves liability for conscious avoidance of the unlawful nature of a portion of the transmitted funds. As discussed below, however, that aspect of the offense is addressed by a two-level increase in the Guidelines. In addition, as also discussed *infra*, the amount of unlawful funds is unknown and, as a practical matter, was not something that Marmilev could readily have determined during the conduct of the offense.

* * *

> The court in [*United States v.*] *Bariek*, [No. 05-150, 2005 WL 2334682, at *2
> (E.D. VA. Sept. 23, 2005)] also argued that "it would be illogical to penalize
> unlicensed money transmitters without regard to the amount of money they
> transmitted." *Id.* In a vague sense the argument has some merit: the more money
> an unlicensed business transmits, the higher the odds of some of the transmissions
> defeating some public interest, such as the policies trying to thwart the financial
> activities of terrorist organizations. But the link is far more attenuated than the
> one between such risks and a failure to *report* a financial transaction—or
> structuring to avoid reporting—which *directly* undermines the government's
> ability to track the money. Treasury regulations identify types of transactions
> required to be reported, obviously the ones perceived as posing the greatest risks .
> . . Thus, equating failure to secure a license with failure to report misses the
> obvious difference in the likelihood of harm resulting from each offense. The
> language of § 2S1.3 does not equate the two; it makes complete sense. We should
> follow it.

*Id*. at 867-68; *see also United States v. Fregoso-Bonilla*, 05-CR-325 (E.D. WI., Dec. 10, 2007),

2007 WL 4358326 at *3 (finding that § 2S1.3 imposes penalty greater than necessary for § 1960

offenses because such offenses do not require the same willful conduct as other offenses to

which § 2S1.3 is applicable).

Thus, though we acknowledge the applicability of § 2S1.3 and its incorporation of the

loss table in § 2B1.1, we nonetheless maintain that, in this case, the resulting 28-level increase

based solely on the quantity of transmitted funds results in an offense level that significantly

overstates the seriousness of Marmilev's conduct.

Furthermore, to a certain degree, the Government is putting the cart before the horse

because there has long been widespread confusion as to the applicability of existing regulations

to virtual currencies. Moreover, the confusion is far from unfounded because financial

regulatory authorities at both the state and federal levels have failed to provide meaningful

guidance.

11

Indeed, it was not until March 18, 2013—*just two months prior to Marmilev's indictment*—that the Financial Crimes Enforcement Network ("FinCEN") issued guidance clarifying that businesses engaged in transmitting virtual currency are required to register with the Treasury Department.  Exhibit 1, Department of Treasury, FinCEN Guidance Memorandum, dated March 18, 2013, "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies" ("FinCEN Guidance").

Specifically, the FinCEN Guidance explains "Currency vs. Virtual Currency," provides definitions of users, exchangers, and administrators of virtual currencies, and clarifies the applicability of FinCEN regulations promulgated under the Banking Secrecy Act to the various parties involved in a virtual currency transaction.  Exhibit 1, FinCEN Guidance.  The fact that FinCEN determined it necessary to issue such basic guidance in March 2013 demonstrates the substantial confusion in the industry that existed prior to that point.[2]

Thus, prior to the FinCEN Guidance, it was not clear that LR qualified as a virtual currency—as opposed to a prepaid access service (i.e., a digital wallet), which does not require a license.  *See* Exhibit 1, FinCEN Guidance.  Consequently, we submit that the Court should consider the fact that—as late as March 2013—the need for LR to register was sufficiently unclear that FinCEN deemed it necessary to issue guidance.  Accordingly, though we accept the $209 Million amount for Guidelines purposes, under § 3553(a), we submit that the Court can consider that it was only during the last two months of LR's operation that the need for registration with the Secretary of the Treasury was clarified.

Thus, when spread over the approximately seven years, or 84 months, that LR operated, $209 Million amounts to about $2.5 Million per month.  Therefore, the amount of funds

---

[2] It is not only federal regulators that are behind the curve.  On July 17, 2014, New York became the first state in the nation to issue proposed regulations for the licensing of virtual currencies.

transmitted during the two months following the FinCEN Guidance regarding the need for the registration of virtual currencies is approximately $5 Million, which yields an offense level increase of 18 as opposed to 28 as in the Plea Agreement.  U.S.S.G. § 2B1.1.

Using these figures, Marmilev's total offense level would be reduced from 33 to 23 with a corresponding advisory range of imprisonment of 46-57 months.  Thus, in light of the FinCEN Guidance, we submit that the Guidelines substantially overstate the seriousness of the offense.  Under the rule of lenity, this approach has considerable merit.

As the Supreme Court has made plain, where the law is unclear, it should be read in favor of the defendant: "Under a long line of our decisions, the tie must go to the defendant.  The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  *United States v. Santos*, 553 U.S. 507, 514 (2008) (citing cases).

Moreover, as a more general matter, we note that there is growing acknowledgment that in economic offenses the Guidelines frequently result in unreasonably high sentences.  As a result, there is building momentum to amend the Guidelines in connection with financial crimes to achieve a measure of culpability that is not unduly driven primarily by the quantity of funds involved in an offense.  *See, e.g.*, Exhibit 2, American Bar Association "A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes," November 10, 2014 ("ABA Proposal") (Task Force Members include, among others, the Honorable Gerard Lynch, C.J.; the Honorable Jed Rakoff, U.S.D.J.; and the Honorable John Gleeson, U.S.D.J.); *see also* Exhibit 3, Statement of the Honorable Jon O. Newman, C.J, before a hearing of the United States Sentencing Commission, dated July 9, 2009 (discussing need for Guidelines reform, particularly in the area of financial crimes, due to

flawed approach of incremental immorality, which yields illusion of accuracy when in reality many variables impact the gathering of evidence and yield approximations at best, *id.* at 6-7).

Under the ABA proposal, the loss table would be modified to limit offense level increases to a maximum of 14, which would reduce Marmilev's Guidelines by 14 levels. Exhibit 2, ABA Proposal at 2. In addition, in a non-violent case such as this one where the defendant has zero Criminal History points, the ABA Proposal further recommends that the total offense level not exceed 10 and encourages sentences other than imprisonment in such instances. *Id.*

In light of all of the above, we respectfully submit that the 28-level increase in the Guidelines due solely to the amount of funds transmitted over a seven-year period contributes to an unreasonably high offense level in the instant matter. Moreover, we respectfully submit the effective Guidelines sentence of 60 months imprisonment is excessive in light of the above. Consequently, we submit that the nature of the offense weighs in favor of a non-Guidelines sentence.

## The Amount of Funds Derived from Unlawful Conduct is Unclear

As stated at the time of his plea, Marmilev "*believed* that a *substantial* amount of funds from the United States moving through Liberty Reserve came from high yield investment programs [("HYIPs")] that [he] *believed* had a high probability of being fraudulent . . . ." Plea Tr. 14 (emphasis supplied). Contrary to the PSR, however, Marmilev neither admitted nor is in a position to know that the entire $209 Million was the "proceeds of unlawful activity . . . ." *Compare* PSR ¶ 84 *with* Plea Tr. 13-14. Indeed, the conclusion in the PSR is fallacious.

To begin, a "substantial amount" does not mean all, or even a majority, of the funds; indeed, no one would argue that $1 Million is an insubstantial sum, but it is far from $209 Million. As indicated in his plea allocution, Marmilev believed that a substantial amount of the

14

funds at issue involved high yield investment programs, which Marmilev suspected had a high probability of being fraudulent.  Plea Tr. 14.  His suspicion was based on his understanding that HYIPs are sometimes fronts for fraudulent Ponzi schemes—something about which LR explicitly warned its customers.  Exhibit 4, LR Consumer Alert.

The reality, however, is that Marmilev has no specific knowledge as to how much of that money was from lawful activity and how much was from unlawful activity.  Moreover, as the PSR makes abundantly clear—and as we discuss in greater detail below—the Government is in no better position to state the matter with any certainty.

Critically, as also discussed below, there was no ready way for Marmilev to discern which investments were legitimate and which were Ponzi schemes.  Indeed, as we all learned from the *Madoff* case, fraudulent schemes can go undetected for decades even when subject to vigorous scrutiny.  Further, because the Government cannot state the amount of funds from unlawful conduct with any certainty, it would be inequitable to permit the uncertainty to be resolved to Marmilev's detriment.

In this instance, we submit that the Guidelines appropriately account for this uncertainty. Indeed, in comparison with the 28-level increase for the quantity of funds transmitted, Marmilev's "belief" that a substantial portion of the funds involved in the offense was derived from unlawful conduct results in a two-level increase.  U.S.S.G. § 2S1.3(b)(1) (if "defendant knew or believed that the funds were proceeds of unlawful activity . . . increase by 2 levels").

As the remainder of our discussion of the offense demonstrates, a two-level increase is appropriate for an offense that is primarily a licensing offense.  Indeed, despite Probation's considerable efforts to portray LR as an organization designed to appeal to customers engaged in unlawful conduct, *see, e.g.,* PSR ¶¶ 36-38, as discussed below, the facts tell a far different story.

15

Consequently, as noted above, we respectfully submit that the nature of the offense weighs in favor of a sentence below the effective advisory Guidelines sentence—and, as demonstrated below, the circumstances of this case strengthen that conclusion.

### 2.    Liberty Reserve Was Designed to Provide the Disenfranchised Access to the Global Economy—Not to Attract Criminals.

LR was far from the criminal organization that the Government depicts.  The brainchild of two of Marmilev's co-defendants, LR was created to provide millions of people around the globe who are disenfranchised from mainstream financial channels a means to access goods and services via the internet through the use of online prepaid currency accounts.

Given our nation's dependence on credit and debit cards, it is difficult to fathom that millions of people around the world—honest, hardworking people—do not have credit cards or even bank accounts.[3]  As such, they are unable to avail themselves of the benefits of the global digital economy in which we live.  Thus, LR was conceived as a competitor to PayPal in markets in which people do not have the requisite credit and banking infrastructure to enable them to utilize PayPal's services.[4]

Indeed, the U.S. Treasury Department's Under Secretary for Terrorism and Financial Intelligence has acknowledged the ability of virtual currencies to empower people currently excluded from the mainstream financial system:

> At Treasury, our approach to regulating virtual currency is rooted in two guiding principles: fostering innovation and ensuring transparency.

---

[3] Indeed, there are numerous people in the United States and even in New York who are unable to obtain bank accounts for a variety of benign reasons.  Exhibit 5, "Bank Tool Is Expanding Unbanked Households, Regulators Say," New York Times, June 15, 2014 (reporting that "roughly 10 million households in the United States lack even a basic bank account" and that "more than 825,000 New Yorkers" do not have bank accounts).

[4] PayPal requires its customers to have either a credit card or a bank account to utilize its services.

> We place real value on the benefits of financial innovation. Advancements in technology that allow entrepreneurs and businesses to innovate, grow, and hire are crucial to our country's long term economic success. **Financial innovation fosters financial inclusion – developing financial products and services to reach both the unbanked and underserved populations**.

> And so one of our core goals is to create an environment in which promising new financial technologies can flourish.

Exhibit 6, Remarks From Under Secretary for Terrorism and Financial Intelligence David S. Cohen on "Addressing the Illicit Finance Risks of Virtual Currency," March 18, 2014 ("Cohen Remarks") at 2.

Contrary to the depiction in the PSR, LR was not designed to facilitate criminality and the evidence does not support the claim that it was used primarily by criminals. For example, as the BBC reported when the Government closed LR, the company had many legitimate users that suffered substantial losses as a result of the closing of LR:

> They include Mitver Holdings, the firm behind a facility called ePay Cards. This allows consumers outside the US to buy goods from stores in the country as if they owned a locally-issued Visa or MasterCard credit Card.

> The company – which has offices in London and Texas – used Liberty Reserve as a way for its customers to charge up their "virtual" credit cards.

> Co-founder Mitchell Rossetti said he had about $28,000 sitting in his business's Liberty Reserve account at the time the site went offline.

> "**We used Liberty Reserve because it was quick, efficient and secure**," he told the BBC.

> "**Now, we – and thousands of others who were dependent on it** – have been left with nothing to look at except a blank webpage, and nothing more to go on than reports from the Costa Rican press."

Exhibit 7, "Liberty Reserve Digital Money Service Forced Offline," BBC News, May 27, 2013.

The BBC report also emphasizes that **many LR customers** "**used the service for legitimate means, viewing it as a cheaper alternative to PayPal**." *Id*. (emphasis supplied).

The BBC report is confirmed by the regular surveys that LR itself conducted, which indicate that LR's customers primarily used the service for such legitimate purposes as online shopping, sending money to family and friends, and bill payment.  *See, e.g.,* Exhibit 8, Liberty Reserve Survey at 2.

In addition, there is substantial evidence that LR voluntarily assisted law enforcement agencies on multiple occasions.  When Government entities sought LR's assistance in tracking suspected criminal activity, LR readily provided information and willingly assisted in law enforcement investigations.  *See, e.g.,* Exhibit 9, Correspondence between LR and Law Enforcement Agents (indicating that LR voluntarily provided extremely helpful assistance to law enforcement upon request); *see also*, Exhibit 10, Letter from Sylvia Lopez Saenz, LR Compliance Officer to FBI Special Agent Mark C. Ray, dated October 3, 2011 (providing requested information regarding LR customer to FBI) (additional letters not included here were also sent to S.A. Ray on October 5 and October 6, 2011); Exhibit 11, Letter from Sylvia Lopez Saenz, LR Compliance Officer, to Metropolitan Police Central Special Agent Frank Tutty, dated October 26, 2011 (providing requested information regarding LR customer to law enforcement).

Nonetheless, to support the notion that LR was primarily utilized by criminals, the PSR points to the fact that a number of accounts were opened "under blatantly fictitious names, often using names signaling the users were involved in criminal activity."  PSR ¶ 24.  In support of this claim, approximately 47 such names are listed in the PSR.  PSR ¶ 24.  The picture painted in the PSR, however, is inaccurate for a number of reasons:

First, notably absent from the PSR is any indication that there is any evidence whatsoever that any of the identified accounts was actually used in connection with any criminal activity. Indeed, we have not seen any direct evidence of a single criminal transaction.

18

Second, given the scope of LR's business, the fact that 47 names indicate a likelihood of criminal activity is *de minimis*.  Indeed, as indicated in the PSR, LR had 5,100,000 user accounts as of May 2013.  PSR ¶ 31.

Third, in all likelihood, the accounts identified in the PSR were either unused or engaged in transactions involving minimal funds because, as discussed below, LR subjected larger accounts to more rigorous verification procedures, which would have ferreted out any blatantly criminal accounts of significance.

In addition, there is no indication that any of the names that supposedly signal the likelihood of criminal activity were associated with accounts held by customers in the United States, which are the relevant accounts for purposes of the offense to which Marmilev pled guilty.  In this regard, we note that the PSR reports that eighty-eight percent (88%) of LR's business did not involve the U.S.  PSR ¶ 32.

The PSR also identifies a handful of websites that it claims "were clearly oriented toward criminal clients."  PSR ¶ 38.  This claim is based entirely on speculation, not evidence.  Indeed, a website that purchased goods on the internet and then reshipped them to customers in exchange for LR is deemed to be of no value to legitimate users because of the high fees charged.  PSR ¶ 37.  What is ignored, however, is that the website enabled users in countries, such as Russia, where people typically do not have credit cards, to purchase legitimate items that they would not otherwise be able to buy online because the items were sold on websites that accept only credit cards.  Thus, paying high fees for items in demand, such as popular mobile phones and designer clothing, is justifiable to these users.

Moreover, upon information and belief, even with the high fees, the ultimate price for these goods was frequently less than if the customers were required to purchase the goods with

hard currency through traditional retail vendors in their home countries. Furthermore, as noted in the PSR, a transaction was completed with the shipping of the purchased goods to the customer's physical address. The use of the website for criminal purposes, therefore, seems an unlikely choice for criminals. Nonetheless, the PSR summarily labels these customers criminals, along with the users of a number of other services that could well be used for legitimate purposes. PSR ¶¶ 37-38.

The PSR also relies on data from Google Analytics to support its claim that LR was designed for criminals. PSR ¶¶ 39-42. As indicated in the PSR, Google Analytics is a service that provides its customers with information about the technical usage of their websites. As with other data relied upon in the PSR, however, the conclusions drawn from the Google Analytics data are similarly based largely upon speculation and inference and not direct evidence.

For example, according to Probation, the data indicates that websites that utilized LR's shopping cart interface ("SCI")—which is a button on a merchant's website that allows a customer to pay with LR (or a credit card, PayPal, etc.)—were engaged in selling stolen credit card data, online gambling, online fraud, and internet proxy services. PSR ¶¶ 41-42. Upon scrutiny, these claims do not support the conclusion that LR was designed to attract criminals.

First, the PSR indicates that it identified approximately 1300 websites involved in credit card fraud. PSR ¶ 41. Given that LR had 5,100,000 users, this is an infinitesimally small amount. Moreover, these websites—in addition to LR—also accepted Western Union, PayPal, and MoneyGram as methods of payment, and yet their allegedly criminal nature apparently went undetected by these well-established money transmitting businesses. *See, e.g.,* Exhibit 12, FBI Screenshot of Website (indicating accepted forms of payment as LR, Western Union, and MoneyGram).

Second, a careful reading again reveals that the PSR's allegation that these sites were involved in criminal conduct is speculative.  For example, a site called "planetofbets.com" is identified as a "likely gambling site."  PSR ¶ 42, n.1.  Similarly, sites offering foreign currency exchange services are deemed criminal based on a report that indicates that such sites are "often forms of 'high-yield investment programs' or 'get rich quick' schemes."  PSR ¶ 42, n.3.  These allegations are simply unsupported.

In addition, while it is correctly indicated in the PSR that Google Analytics could enable LR to determine the sites that its users visited prior to navigating to LR—and, according to the PSR, the "likely" criminal nature of such sites—the Google Analytics data does not identify the LR accounts associated with particular websites.  Thus, knowledge of the websites that referred people to LR is of limited utility.[5]

We, therefore, suggest that given the small volume of sites identified combined with the speculative nature of the claims of criminality, the Google Analytics data does little to further either the claim that LR was designed to accommodate criminals or that it was primarily used by criminals.

The conclusions drawn from the data obtained from LR's servers are similarly frail in that they are based on an exceptionally small amount of data and are wholly speculative, for example: **(1)** "The criminal nature of many of these merchants is *self-evident . . .* " PSR ¶ 43; and **(2)** "a substantial amount of the activity in the [LR] system can be traced back to *likely* criminal activity," PSR ¶ 44 (emphasis supplied).  It is insufficient to draw conclusions from the so-called "self-evident" nature of these "likely" criminal websites given that these same sites presumably

---

[5] In addition, as we demonstrate in the section below in which we discuss Marmilev's role in the offense, the PSR ignores entirely the purpose for which Marmilev used data from Google Analytics, which was for troubleshooting technical problems encountered by users of the LR website and had nothing to do with determining the nature of websites using LR.

escaped the scrutiny of the FBI and other law enforcement agencies around the globe.

Furthermore, among the criteria for determining criminality was "account names," PSR ¶ 44, n.4, which is a particularly weak basis upon which to draw such a conclusion. For example, accounts with names that include "cvv," "card," or "HYIP" are summarily deemed criminal without any evidence at all.

Apart from the fact that a determination of criminality cannot be made from the name of an account, the fact that LR required the use of account names, and stored account names, transaction histories, and login data cuts against the conclusion that LR was designed to attract criminals. *See, e.g.,* Exhibit 13, Payment Transfer Record (indicating date, amount, and account names and numbers). If LR were in fact designed to attract criminals, it is much more likely that it would not have required or stored such information. In this regard, we note ironically that the United States allows the use of bitcoin—which a number of countries have banned—and it is by design totally untraceable and anonymous.

Finally, regarding all of the various websites identified in the PSR as "likely" engaged in criminal activity, as referenced above, a majority of those sites allow payment not only with LR but also with PayPal and Western Union, both of which are registered with FinCEN. *See, e.g.*, Exhibit 12, FBI Screenshot of Website. Thus, U.S. registration and compliance with U.S. anti-money laundering ("AML") protocols is apparently insufficient for these well-respected businesses to eliminate the use of their services for "likely" criminal purposes.

As noted above in reference to the *Madoff* case, the reality is that discerning which websites are engaged in unlawful activity and which are legitimate is not as easy or simplistic as portrayed in the PSR. In fact, quite recently, it was discovered that Secure Investments, one of the largest online foreign currency exchanges, disappeared overnight with more than One Billion

22

Dollars of invested funds.  Exhibit 14, Bloomberg News, "Forex Investors May Face $1 Billion Loss as Trade Site Vanishes," dated November 13, 2014, ("Secure Investments Article").

The machinations that Secure Investments employed to appear legitimate were complex and difficult to uncover until—as eventually happens with most Ponzi schemes—new investments were insufficient to satisfy returns on existing investments, at which point the site vanished along with an enormous amount of money invested by individuals in multiple countries.   Exhibit 14, Secure Investments Article.

By the logic in the PSR, however, the fact that Secure Investments was an online foreign currency exchange should have been sufficient to put people on notice of its fraudulent nature. Were that true, however, one would have to ask why it—and so many others—have not been the subject of law enforcement action.  The reality is plain—while one might have an intuitive understanding that certain types of businesses have a high probability of being engaged in fraudulent activity, there is no ready means to discern the good from the bad.  Thus, the Government's 20-20 hindsight notwithstanding, the evidence simply does not support the claim that LR was designed to attract criminals.

The PSR also attempts to portray LR's use of third-party exchangers as evidence that LR was designed to appeal to criminals.  PSR ¶¶ 26-30.  This claim, too, is flawed.  Indeed, as explained below, the use of exchangers provided another layer of protection against criminal activity.

The PSR accurately explains that LR customers could not deposit or withdraw currency directly from LR.  PSR ¶¶ 26-28.  In order to move currency into or out of LR, "a user would typically have to send the money through a bank, or a money transmitter such as Western Union . . . ."  PSR ¶ 30.  Given that both banks and money transmitters, such as Western Union, are

required to adhere to currency reporting requirements (including filing SARs), client verification requirements, and other banking regulatory procedures, LR's system in reality had a built in safety net to protect against the transmission of unlawful funds, and, as noted, a single transaction has yet to be identified as definitively criminal.

Indeed, financial regulators have recognized that the involvement of multiple links in a virtual currency transaction is common and creates an opportunity for greater detection of illicit transactions.  A recent FinCEN report makes the point:

> Various financial institutions (FIs) including, but not limited to, **Virtual Currency Exchangers**, other Money Transmitters, other types of Money Services Businesses, and Depository Institutions may all be involved in the chain of transactions making up the lifecycle of a user's purchase, use and sale of Bitcoin for currency of legal tender.  This may include depository institutions that house the accounts of virtual currency users, administrators, and exchangers; additionally, depending on the transaction, correspondent banks may also be involved.  **Each institution has a unique vantage point from which to observe these transactions and identify suspicious activity.**  FinCEN encourages the use of information sharing under 314(b) in this context.  . . .
>
> **Virtual Currency Exchangers** (and other VC entities) **may have a unique view of the activities of their users and counterparties** as they enter and exit the virtual currency economy and conduct transactions within that economy.

Exhibit 15, FinCEN SAR Stats Technical Bulletin, July 2014 at 15-16, (emphasis supplied).  Thus, there is nothing unusual or nefarious about utilizing third party exchangers.  In fact, combined with the information that LR obtained from its customers, the "unique view" of the exchangers in actuality enriched the information potentially available to law enforcement.

Moreover, the evidence demonstrates that LR required its exchangers to comply with the financial regulations of the countries in which the exchangers operated.  Our review of the discovery indicates that LR required extensive documentation from its exchangers to ensure that they were in compliance.  *See, e.g.*, Exhibit 16, Compliance Application and Related

Correspondence between Exchanger Exhere Limited and LR;[6] *see also* Exhibit 18, Exchanger

Affiliation Agreement (requiring, among many other things, compliance with the laws of the

country in which the exchanger is located, international law, and Costa Rican law); Exhibit 19,

Email from LR to Exchangers, dated February 24, 2011, requiring additional information or, in

the alternative, informing exchangers that their accounts would be terminated; Exhibit 20,

World-Check Verification for Exchanger Soetrisno Surjoputro.

Furthermore, Under Secretary for Terrorism and Financial Intelligence David S. Cohen

has stated that regulation of virtual currency is most effective at the points at which it enters and

exits the financial system, i.e., in the case of LR, exchangers:

> The guidance explains that **administrators [such as LR] and exchangers of virtual currency** are money transmitters under existing regulations, and thus must register with FinCEN, keep particular records, and report suspicious transactions to adequately guard against money laundering and terrorist financing abuse.

> In essence, FinCEN's guidance clarifies that **our illicit finance regulatory focus – at present – is on those who facilitate the entry and exit into a convertible virtual currency system**.

> * * *

> Importantly, FinCEN's guidance also explains that **those who simply use virtual currencies for transactions – such as buying goods or services online – are not subject to regulatory requirements**.

> * * *

---

[6] Exhibit 16 is a small portion of the Exhere verification file provided in discovery. The selected pages demonstrate by way of example that LR did not rubber stamp exchanger applications but rather required extensive documentation (including bank records, certified passports, and certificates of translation), insisted on notarized documents, made numerous follow-up requests for information, including additional information regarding verification procedures, and adjustments to the "Know Your Customer" section of the application. Our review of the discovery makes clear that LR's approach to the verification process with Exhere was not unique but rather is indicative of the care with which LR approached each application. *See, e.g.,* Exhibit 17, User Verification for Companies Document Checklist.

25

> At present, **the crux of FinCEN's regulatory framework for convertible virtual currencies focuses on the moment "real" money is exchanged into virtual currency, and when virtual currency is exchanged back into "real" money**.  As I noted earlier, **we regulate the entries and exits of the virtual currency world**.  And at current adoption levels, **we think that this type of oversight is sufficient to guard against money laundering and other illicit finance threats**.

Exhibit 6, Cohen Remarks at 6 (emphasis supplied).  Thus, LR's use of exchangers and its verification procedures and policies are in keeping with precisely what FinCEN recommends— and are not indicative of a system designed to accommodate criminals.[7]

Furthermore, there is ample evidence that LR proactively sought to prevent criminals from using its service.  In fact, there are clear instances in which LR froze accounts that it detected were engaged in suspicious activity.

A search of the LR database provided in discovery revealed that LR voluntarily froze approximately 5,000 accounts that it suspected were using LR to transmit criminal proceeds or were otherwise engaged in criminal conduct.  *See, e.g.*, Exhibit 22, Email Correspondence Regarding Avo (LR froze Avo's account due to suspicious activity); *see also* Exhibit 23, Letter from Silvia Lopez Saenz, Compliance Officer to Ever Navarro, Financial Intelligence Unit, dated August 3, 2011 (detailing LR's actions re: freezing a user account for failure to comply with verification requirements due to high volume of funds in account).[8]

In addition, LR provided its customers with guidance as to how to avoid falling prey to fraud and other criminal schemes on the internet.  Exhibit 4, LR Consumer Alert.

---

[7] Moreover, the discovery demonstrates that—at least in some instances—LR required U.S. customers to provide copies of their passports as well as copies of utility bills and other documentation to verify their identities.  *See, e.g.*, Exhibit 21, Verification Documentation for Customers in the United States.

[8] In Marmilev's objections to the PSR, we noted that LR froze at least 11,000 accounts, which may well be the case.  At this time, however, we can confirm that LR froze 5,000 accounts.

Moreover, as acknowledged by FinCEN and noted above, LR's system of transmitting funds is not uniquely appealing to criminals.  Criminals utilize PayPal, Western Union, and even cash in the form of the United States Dollar for criminal transactions and yet no one suggests that these forms of payment were designed to facilitate money laundering—despite the prevalence of their use for that purpose.  The problem, therefore, is not the manner in which LR was designed.  As discussed above, the problem is the lack of a suitable regulatory system and a corresponding lack of technology capable of preventing criminals from misusing emerging financial systems.

We, therefore, submit that LR's design to serve the unbanked, its use of exchangers, its voluntary cooperation with law enforcement, and the corresponding lack of any evidence that LR catered to criminals are circumstances surrounding the offense that weigh in favor of a sentence below the effective Guidelines sentence.

### 3. Liberty Reserve Was Compliant with Costa Rican Licensing Requirements and Employed Anti-Money Laundering Procedures.

LR formed in Costa Rica because it intended to focus initially on servicing customers in South and Central America, and Asia, as well as because it learned from the example of predecessor businesses – in particular E-Gold – that the United States is hostile to virtual currencies.[9]

In contrast to the United States, Costa Rica was willing to work with LR to craft anti-money laundering guidelines and verification procedures to enable LR to obtain an appropriate license—as discussed *supra*, regulations and guidance regarding virtual currency are only now beginning to be formulated in the United States.  Thus, though Probation claims that LR

---

[9] We discuss *infra* the fallacies in the PSR concerning the supposed lessons that Marmilev and his colleagues learned from the prosecution of E-Gold.  PSR ¶¶ 50-51.

incorporated in Costa Rica so that it "would succeed in eluding law enforcement where E-Gold had failed . . ." the claim is inaccurate and unsupported by the evidence.  PSR ¶ 51.

Indeed, in or about 2008, LR embarked on the process of obtaining a license from the Costa Rican agency known as the Superintendcia General de Entidades Financieras ("SUGEF"). As reflected in the discovery that the Government has produced, LR dutifully engaged with SUGEF beginning in 2008 up until approximately November 2011 in the complex process required to obtain a license for its business.  *See, e.g.*, Exhibit 24, Letter from Silvia Lopez Saenz to Luis Figueroa Retana, dated November 7, 2011 (detailing LR's efforts to meet SUGEF requirements).

At the instruction of SUGEF, LR employed various anti-money laundering procedures in order to qualify for a license and to prevent criminal activity.  The following are among the steps that LR took to prevent its system from being used to launder money:

a. LR developed internal policies, procedures, and controls, including an 85-page Compliance Manual, which is available upon request.

b. LR hired a highly qualified and experienced compliance officer.  PSR ¶ 61.[10]

c. In accordance with instructions from SUGEF, LR implemented an alert system to identify individuals on the United States Department of the Treasury's Office of Foreign Asset Control ("OFAC") list of Specially Designated Nationals ("SDN"):

> As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries.  It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-

---

[10] Though it is claimed in the PSR that the compliance officer complained about LR's AML policies, Marmilev is unaware of evidence to support that claim and, in any case, in his role as a technical expert he was unaware of any dissatisfaction on the part of the compliance officer.

> specific.   Collectively,   such   individuals   and
> companies   are   called   "Specially   Designated
> Nationals" or "SDNs."  Their assets are blocked and
> U.S. persons are generally prohibited from dealing
> with them.

http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

*See, e.g.,* Exhibit 25, Email from Maxim Chukharev to Mark Marmilev, dated

March 25, 2011 Re: Compliance with SUGEF requirements for SDN alerts.

d.      LR engaged an independent consultant to train its employees in procedures to

detect and to deter money laundering.

e.      LR had a user agreement and website disclaimer that set forth policies and

procedures prohibiting the use of LR for criminal activity.  *See, e.g.*, Exhibit 26,

LR "Terms of Service" and "Anti-Money Laundering Policy."

As part of its efforts to ensure compliance with SUGEF's AML requirements, LR tested

its employees to determine whether they were sufficiently knowledgeable about the requirements

of the law—notably, the employees had an average score of 89.86% and only two scored below

the required 70% and were required to be re-tested.  Exhibit 27, Memorandum from Silvia Lopez

Saenz, Compliance Officer to Laura Marin, Administrative Manager, dated January 6, 2011.  LR

also tested relevant employees regarding their knowledge of LR's Know Your Client Policy—

the average score was 98.33%.  Exhibit 28, Memorandum from Silvia Lopez Saenz, Compliance

Officer to Floribeth Solano, Administration Department, dated April 7, 2011.

In addition, as discussed above, LR had comprehensive requirements for companies

seeking to serve as exchangers.  Exhibit 29, User Verification for Companies Document

Checklist; Exhibit 30, Know Your Customer Questionnaire.  Furthermore, as noted above, LR froze approximately 5,000 accounts suspected of unlawful conduct.[11]

Moreover, throughout the entirety of the licensing process in Costa Rica, the documents produced to us do not indicate that SUGEF ever suggested that it was dissatisfied with LR's efforts at compliance or that it deemed LR unsuitable to operate—indeed, SUGEF allowed LR to continue to operate throughout the licensing process.

Furthermore, LR's offices were in the same building complex as the SUGEF offices—plainly not the decision of a company seeking to evade regulation.  In addition, if, as the Government contends, LR had in fact formed in Costa Rica to avoid licensing requirements, it would stand to reason that LR would have left Costa Rica as soon as it discovered that Costa Rica required LR to obtain a license and to implement AML procedures.

To the contrary, however, LR complied with SUGEF's requirements throughout the three-year licensing process and SUGEF moved steadily toward granting LR a permanent license.  Moreover, LR had interim licenses throughout its tenure in Costa Rica, which was willing to create a regulatory framework within which virtual currencies could operate.  By contrast, as noted above, it was not until 2013 that the U.S. even began to make efforts to create regulations applicable to virtual currencies.

Notwithstanding all of the above, it is inaccurately claimed in the PSR that LR "had no intention of implementing an effective AML program."  PSR ¶¶ 61-66.  In the PSR, it is correctly explained that LR hired a well-respected Costa Rican banker to serve as its general manager and an experienced compliance officer to oversee its AML program.  PSR ¶ 61.  The

---

[11] A detailed Excel spreadsheet highlighting numerous accounts that LR froze—upon suspicion that a customer engaged in fraudulent activity or hacking, for example—is not suitable as an attachment but is available upon request.

PSR also describes the fact that LR created a "Government Administrative Area ("GAA")" through which the general manager and compliance officer could view statistics regarding LR's accounts and transactions.  PSR ¶ 62.  Further, the PSR correctly reports that LR used the GAA to create "statistics that underreported the volume of transactions being processed by" LR.  PSR ¶ 66.

The PSR, however, incorrectly concludes that underreporting the volume of LR's business to Costa Rican authorities evidences a lack of intent to implement an effective AML program.  PSR ¶ 62.  There is nothing in the evidence to indicate that the GAA was designed to hide or to facilitate money laundering.

The GAA did not alter specific transactions, customer data, or any other information that would indicate an effort to avoid compliance with AML protocols.  The GAA "underreported the volume of transactions" that LR processed in the aggregate.  PSR ¶ 66; *see also* PSR ¶ 63 ("Liberty Reserve would be able to . . . create fake statistics concerning the *volume* of transactions passing through Liberty Reserve . . . ." (emphasis supplied)).

Though there is no direct evidence regarding the reason for doing so, the obvious motivation for underreporting the volume of LR's transactions is to hide LR's income—most likely to avoid taxation.  Thus, though far from laudable, the creation of the GAA is not evidence of an effort to hide the use of LR by criminals, especially in view of the fact that LR retained customer data and transaction histories.

Moreover, with respect to the "Hidden Admin ("HA")" area that was used to control the statistics accessible in the GAA and which could also "hide account information for any specific accounts flagged in the HA," the only hidden account was LR's own internal account, which was

31

used only for internal transactions.  The concealment of LR's internal account, therefore, did not interfere with SUGEF's efforts to monitor LR's compliance with AML requirements.

Furthermore, though as described in the PSR it would appear that LR failed to obtain a permanent license from Costa Rica due to the implementation of the GAA, and the subsequent resignation of its general manager and apparent dissatisfaction of its compliance officer, PSR ¶ 66, the reality is otherwise; FinCEN covertly maneuvered to destroy LR.

The SUGEF licensing process screeched to a halt on November 18, 2011 when FinCEN sent a secret notice to SUGEF stating that it had information that criminals—including terrorists—were using LR to conduct illegal transactions.  Exhibit 31, FinCEN Notice, dated November 18, 2011.

Despite the fact that FinCEN did not provide any evidence to support the allegation that criminals were utilizing LR, the notice effectively terminated LR's license application process, which was plainly FinCEN's goal.  We note in this regard that the allegation that terrorists were using LR is wholly unsupported by the evidence—indeed, it is entirely absent from the Indictment.  It, therefore, appears plain that FinCEN included the accusation in its notice to Costa Rica and other countries as a means to an end—namely, the destruction of LR.

The transparency of FinCEN's motives is further demonstrated by the fact that—though the FinCEN notice does not state that LR was complicit in the criminal nature of the alleged transactions—FinCEN chose not to disclose the notice to LR, which consequently deprived LR of the opportunity to work with the authorities to thwart criminal activity and potentially apprehend any such criminal users.  FinCEN's decision in this regard is particularly remarkable because—as discussed above—LR voluntarily assisted law enforcement investigations on

several occasions, including those conducted by the FBI.  It, therefore, appears plain that eliminating LR—not criminal activity—was the goal.

Once the SUGEF licensing process terminated, the evidence indicates that LR moved its computer servers to another country and began transferring its assets out of Costa Rica to avoid running afoul of the Costa Rican government, which had withdrawn its support for LR in response to U.S. intimidation.  Nonetheless, as reflected in the discovery, LR continued to employ AML protocols even after it ceased operating in Costa Rica.

Moreover, the PSR inaccurately claims that, following the termination of the licensing process in Costa Rica, LR continued to "operate underground" in Costa Rica.  PSR ¶ 22.  Our review of the evidence, however, shows that LR was in the process of obtaining a license to operate in Cyprus even before the FinCEN Notice.  Exhibit 32, Invoice from KPMG to LR, dated June 17, 2011, Re: Application to Operate Electronic Money Institution in Cyprus. Therefore, while it may be that some customer service employees and other support personnel remained in Costa Rica, our review of the evidence indicates that the business itself ceased operations in Costa Rica and relocated.

Thus, despite the fact that LR was unlicensed in the United States, LR made substantial efforts to obtain a permanent license to operate in Costa Rica, which—as demonstrated above— required that LR implement many of the same AML procedures required in the United States. Thereafter, LR relocated its business to Cyprus where, as noted, it also applied for a license to operate.

Consequently, though there is no question about the fact that LR violated United States law by conducting business in the United States without a license—claims to the contrary notwithstanding—the evidence makes clear that LR engaged in a lengthy licensing process with

Costa Rican regulators and employed extensive AML procedures.  Accordingly, Marmilev

submits that these circumstances further support his request for a sentence below the effective

Guidelines sentence.

### 4.    Marmilev's Role in Liberty Reserve.

As he explained to the Court at the time of his plea, Marmilev was responsible for the

technical aspects of LR:

> The Court:   Now, you described for me, I believe, that your responsibility included responsibility for technical aspects of the Liberty Reserve project, is that right?
>
> Marmilev:    Yes.
>
> The Court:   Can you give me an example of something you did to help promote the business of Liberty Reserve by working on the technical aspects?
>
> Marmilev:    I was trying to create a structure that was stable, that was easily accessible to people, that the system wouldn't crash, that the clients would open our web site on any browser[,] that was accessible to blind people.  I was trying to protect it from hackers, from identity thieves.
>
> The Court:   Thank you.

Plea Tr. 18-19.  Marmilev's description of his role is consistent with that contained in the PSR:

> Marmilev's work for [LR] included administering the company's [w]eb site and maintaining its technical infrastructure, advising Budovsky regarding various matters related to the business, and supervising a staff of programmers located in Ukraine, as well as Chukharev, who managed [LR's] local technological infrastructure in Costa Rica.

PSR ¶ 52.

The PSR also indicates that in 2010, Budovsky gave Marmilev a 30% ownership share of

LR.  PSR ¶ 52.  Marmilev's ownership interest, however, did not change his role in the company

or have any meaningful effect – in fact, it is not even clear if the grant of ownership is valid as

there is no indication that LR undertook the necessary corporate actions to transfer ownership to

Marmilev.  In any event, Marmilev was told that his ownership interest would come into play only if LR went public but that it did not entitle him to share in LR's profits or confer any voting rights.

Irrespective of whether Marmilev was technically an owner as of 2010, the fact remains that his role in LR never changed.  His involvement with the company continued to be limited to the technical realm.  Marmilev never had responsibility for licensing or other compliance issues with respect to LR.  Indeed, as noted in the PSR, Marmilev worked in Brooklyn and not in Costa Rica and had limited contact with LR's offices.  PSR ¶ 52.  He primarily communicated with programmers and other individuals responsible for technical matters.  Moreover, there is no evidence that Marmilev was specifically aware of any licensing requirements or any laws regarding such matters.

Marmilev stands by his admission of guilt because as someone involved in the management of LR he is responsible for its failure to register in the United States.  In addition, Marmilev accepts responsibility for his failure to take steps to attempt to confirm his belief that a substantial portion of funds from U.S. customers were transferred in connection with high yield investment programs that he believed were likely fraudulent.  Nonetheless, we submit that his role as the primary technical person in LR—as opposed to someone involved with licensing and compliance issues—is a mitigating factor that the Court can consider in determining an appropriate sentence.

Despite the acknowledgment that Marmilev's role in LR was limited to the technical aspects of the business, the PSR attempts to cast Marmilev as a central player in a web of illegal activity.  As discussed above, we submit that the evidence belies the notion that LR as a whole was engaged in conduct designed to attract criminals.  Nonetheless, even assuming *arguendo*

35

that the allegations regarding LR can be sustained, the evidence does not support the claims regarding Marmilev.

In the PSR it is claimed that Marmilev's knowledge of the criminal case brought against LR predecessor E-Gold proves that Marmilev knew from the outset that LR was embarking upon a plan to operate a business catering to criminals.  PSR ¶¶ 47-51, 56.  This premise is flawed for several reasons.

To begin, in January 2006, when federal law enforcement officers searched E-Gold's offices, Marmilev was a 26-year-old immigrant who had been living in the U.S. for roughly three years.  PSR ¶¶ 47, 106, 111.  Consequently, even if Marmilev was aware of the search due to the fact that it "was reported in the press and in online discussion forums" that Marmilev supposedly followed, PSR ¶ 47, it is more than a bit presumptuous to conclude that he was on notice of the legal intricacies of operating a money transmitting business.

The subsequent indictment of E-Gold and its owners in April 2007 for money laundering and operating an unlicensed money transmitting business, which was also "reported in the media and extensively discussed in online discussion forums," PSR ¶ 50, supposedly followed by Marmilev, similarly is not evidence that Marmilev was aware that LR was designed to attract criminals.  First, unlike LR, E-Gold operated in the United States and held bank accounts in the U.S.  Thus, the need to comply with local licensing requirements was self-evident.  LR, by contrast, was incorporated in and operated from Costa Rica.

Second, while it is true that the defendants in E-Gold pleaded guilty in July 2008, the terms of their guilty pleas are elucidating.  In the E-Gold case, the Government indicted the company and its owners for money laundering and operating an unlicensed money transmitting

36

business.  Exhibit 33, Indictment, *United States v. E-Gold*, 07-CR-109 (RMC) (D.D.C. April 3, 2008) ("E-Gold Indictment").

In the E-Gold Indictment, the Government charged that $145,535,374.26 was laundered, and presumably much more was transmitted.  Exhibit 33, E-Gold Indictment at ¶ 48. Nevertheless, despite the grandiose nature of the charges, the true strength of the Government's case—or lack thereof—became apparent at the time of sentencing.  Notably, not a single defendant was sentenced to a period of incarceration.  Indeed, with the exception of the owner and founder of E-Gold, who received six months home confinement, the defendants received suspended sentences without any period of confinement.  Exhibit 34, *United States v. E-Gold*, Transcript of Proceedings, dated November 20, 2008, ("E-Gold Sentencing"), at 24-25, 59, 116-17.

Moreover, though the Court issued non-Guidelines sentences, the highest sentence that the Government sought was 14 months incarceration, which was based upon an agreement that E-Gold's owner was responsible for between $30,000-$40,000 in money laundering—a fraction of the amount charged in the indictment.  Exhibit 35, Plea Agreement of Douglas Jackson, dated July 18, 2008, ("Jackson Plea Agreement") at 2; Exhibit 34, E-Gold Sentencing at 109.

Furthermore, as part of the resolution of the E-Gold case, E-Gold, which was permitted to continue its operations, was required to implement various anti-money laundering protocols. Exhibit 35, Jackson Plea Agreement at 6-9.  As discussed above, as part of the licensing process with SUGEF, LR implemented many of the same anti-money laundering protocols.  Thus, contrary to the claim that knowledge of the E-Gold prosecution evidences criminal intentions, from Marmilev's perspective, LR attempted to use the lessons of E-Gold to develop a system that would avoid the pitfalls of E-Gold—not repeat the mistakes.

37

It is also incorrectly claimed in the PSR that Marmilev aided LR in attracting criminal customers by opening accounts on HYIP-related websites and discussion forums and offering testimonials about LR. PSR ¶ 51. This allegation is based upon the word of a cooperating witness, which it is claimed is corroborated by the existence of usernames and passwords recovered from Marmilev's laptop computer. PSR ¶ 51. The problem is, the cooperating witness got it only half-right, and the PSR got it wrong.

Marmilev visited the websites at issue in an effort to thwart a fraud that was being perpetrated against LR customers. It came to Marmilev's attention through customer complaints that there were websites that had created links that led users to believe that they were being directed to LR when in fact they were directed to sites that mimicked LR. Once on these fake LR sites, users entered their LR usernames and passwords believing that they would gain access to their LR accounts when in fact they had delivered the necessary information to access their LR accounts to thieves.

As the person responsible for the technical aspects of LR, including cyber security, Marmilev visited a variety of sites and discussion forums in an effort to discover the source of the fraud. His efforts at uncovering the fraud were unsuccessful but his knowledge of it led to his creation of LibertyGuard, which employed a then-unique system now common on many financial sites to prevent further instances of the theft of LR account user data. Marmilev's visits to sites identified in the PSR were, therefore, not designed to facilitate criminality but to prevent it. Moreover, though Marmilev did not dedicate himself to the difficult task of discerning which HYIPs were fraudulent, he employed his skills as a technology expert to develop a tool to enable users to avoid falling prey to online fraud.

The PSR also relies on Google Analytics to support its portrayal of Marmilev as a willing participant in a business designed to attract criminals.  PSR ¶ 55.  As discussed above, the Google Analytics data is not nearly as damning as the PSR suggests.  Furthermore, though it is true that Marmilev had access to Google Analytics data, his use of the data was not focused on marketing and compliance issues that might lead one to the conclusions in the PSR.  Rather, in his capacity as LR's technology expert, he used the data to troubleshoot technical problems reported by users of LR's site.

For example, if LR received a complaint that a customer could not login to LR, Marmilev would ascertain a variety of information from the customer, such as the type of device with which login was being attempted (i.e., a computer, a smartphone, etc.), the brand of the device, the operating system on the device, the web browser (Firefox, Safari, Explorer), the user's internet provider, etc.  Marmilev would then use data from Google Analytics in a process of elimination to determine which of the multiple variables in the login equation was the likely source of the problem.  Thus, if Google Analytics data indicated that customers had logged into LR successfully using Firefox on iPhones, then Marmilev would eliminate those as possible sources of the problem, and so on until he isolated the root cause.

Consequently, the notion that, because of his access to data from Google Analytics, Marmilev must have been aware that LR was primarily being used for unlawful purposes ignores the manner in which Marmilev utilized Google Analytics.  In this regard, it is critical to recognize that Google Analytics contains a massive amount of data.  Access alone is, therefore, an insufficient basis upon which to impute knowledge.

Marmilev's knowledge of Budvosky's conviction for operating an unlicensed money transmitting business and his efforts to assist Budovsky in sanitizing his internet profile are also

cited as support for the conclusion that Marmilev was aware that LR was oriented toward a criminal clientele. PSR ¶ 57. Budvosky's conviction for operating a currency exchange service without a license from the state of New York for which he received five years probation, PSR ¶ 49, is hardly an indication that LR was designed to engage in the large-scale criminality asserted in the PSR and charged in the Indictment.

Moreover, Marmilev's efforts to assist Budovsky in sanitizing his internet profile were the result of the fact that—despite Budovsky's conviction for a state licensing offense— allegations of money laundering of which Budovsky was not convicted caused irreparable harm to his reputation and ability to conduct business. Consequently, Marmilev tried to help Budovsky eliminate the stigma that attached as the result of allegations that were ultimately abandoned when Budovsky pled guilty and was sentenced to probation.

Furthermore, contrary to the assertion in the PSR, Marmilev did not use aliases to hide his association with LR. PSR ¶ 58. Rather, Marmilev used aliases in an effort to protect his LR identity from hackers, which was particularly important given that he had access to many sensitive areas of LR. The aliases are, therefore, not evidence of criminality but an accepted protocol of cyber security.

Marmilev stands by his admission of guilt. He believed that HYIPs that he believed had a high probability of being fraudulent were using LR and he did not act to confirm his belief. Marmilev, however, does not subscribe to the portrayal of LR as a business that was designed to attract criminals. The fact that criminals hijacked the system does not mean that LR was intentionally complicit.

In fact, given the evidence that LR assisted law enforcement when requested, the Government's decision to close LR rather than engage it in the fight against the criminals who

were hijacking its services is incongruous with the Government's stated desire to eliminate the use of money transmitting services by criminals.  Indeed, in shuttering LR, the Government unwittingly opened the door to the rise of bitcoin, which is a decentralized system with a high degree of anonymity that will inevitably be far more useful to criminals than LR could ever possibly have been.

The Government's approach to LR is particularly curious given its approach to other pioneering businesses in the early stages of the development of their industries.  Criminals frequently hijack new technology until protections are developed to prevent further misuse. Email, for example, is used regularly by billions of people, yet, according to a recent report, after more than 20 years of existence, "three quarters of the world's email traffic was spam during December 2013 . . ." which is frequently utilized to install spyware and malware for criminal purposes on the computers of unsuspecting users.  Exhibit 36, "Three Quarters of World's Email Traffic is Spam," January 23, 2014, www.v3.co.uk/v3-uk/news/2324684/three-quarters-of-worlds-email-traffic-is-spam.  In response, the technology industry has been allowed to respond with the creation of continually more powerful tools to block criminals from hijacking the email system.

So, too, have many problems in the mainstream financial industry been met with increased regulation and efforts to ensure compliance—with a decidedly noticeable lack of prosecution of even the most obviously culpable.  Had the Government chosen to engage LR, Marmilev may well have created the necessary technology to protect the public from the misuse of virtual currencies.  Instead, it has merely succeeded in eliminating one competitor from the virtual currency market.

**C.     Marmilev's History and Characteristics Support a Non-Guidelines Sentence.**

Marmilev is 35 years old.  He has no criminal record.  Born in Ukraine and raised in Israel, where he is a citizen, Marmilev came to the United States legally in 2003 on a student visa and later achieved permanent resident alien status.  Marmilev attended Brooklyn College for four years, maintaining a 3.9 grade-point average with a major in computer science and a minor in business administration.

Prior to his arrest, he lived in a modest apartment in Brooklyn with his wife.  In addition to his wife, his maternal aunt, Yanina Izraitel, with whom Marmilev has an exceptionally close relationship also lives nearby in Brooklyn.  Additional details about Marmilev's character and admirable qualities are set forth in the letters from his friends and family—the people who know him best.  Exhibit 37, Letters to the Honorable Denise L. Cote on behalf of Mark Marmilev.

During his pre-trial detention, Marmilev has been an exemplary inmate.  As reflected in a Work Performance Rating issued by the MCC, Marmilev has volunteered to assist with cleaning and painting his unit as well as several inmate cells and tiers.  Exhibit 38, Work Performance Rating – Inmate, dated November 8, 2014 ("Work Performance Rating").  Marmilev "worked numerous hours as a volunteer [and] [h]is effort [was] greatly appreciated."  Exhibit 38, Work Performance Rating at 1.  On a scale of one to five, with five being the best rating, Marmilev was rated a five in all nine categories.  Exhibit 38, Work Performance Rating at 1-2.

We also note that, though § 1960 is a strict liability offense, Marmilev's lack of knowledge regarding the licensing requirement is something that the Court can consider in determining his culpability—particularly given that the Guidelines are driven overwhelmingly by the failure to register and not the fact that a portion of the funds were derived from unlawful

conduct. *Fregoso-Bonilla*, 2007 WL 4358326 at *3 (imposing non-Guidelines sentence for § 1960 violation based in part on lack of knowledge of licensing requirement).

Accordingly, on balance, we respectfully submit that Marmilev's history and characteristics support Marmilev's request for a sentence below the effective Guidelines sentence.

**D.      A Non-Guidelines Sentence Will Avoid Unwarranted Sentence Disparities.**

As demonstrated below, Courts have recognized that in § 1960 prosecutions the Guidelines often call for sentences that are far greater than necessary to achieve the goals set forth in § 3553(a). As a result, Courts have routinely imposed reduced sentences in § 1960 cases. In addition, as noted above, there is growing recognition that in economic crimes in general the Guidelines frequently produce unreasonable results. We discuss below a sampling of cases that demonstrate the point.

The case that most closely resembles the instant matter is E-Gold. Indeed, as far as we are aware, it is the only other virtual currency business prosecuted under § 1960. Thus, contrary to the PSR, the fact that E-Gold—a virtual currency provider that operated within the United States—was prosecuted for money laundering lends support to Marmilev's request for a non-Guidelines sentence. PSR ¶¶ 50-51.

As previously noted, not a single E-Gold defendant went to prison. Exhibit 34, E-Gold Sentencing. In fact, with the exception of the company's founder, who received six months home confinement, the remainder received suspended sentences. Exhibit 34, E-Gold Sentencing. Accordingly, we submit that the sentences in E-Gold are a useful starting point in determining an appropriate sentence in the instant case.

43

In addition, though not a virtual currency case, in *United States v. Mazza-Alaluf*, 621 F.3d 205, (2d Cir. 2010), the Court upheld on a non-Guidelines sentence of 42 months imprisonment for a violation of § 1960.  In *Mazza-Alaluf*, the defendant was convicted of operating an unlicensed money transmitting business in New York, Illinois, and Michigan, which transmitted more than $200 Million dollars.  *Id.* at 207.  The defendant had a Guidelines offense level 32 and was in Criminal History Category I, which yielded an advisory range of 121 to 151 months imprisonment.  *Id.* at 208.  The maximum statutory penalty was 120 months but, based on § 3553(a) factors, the Court imposed a sentence of 42 months, i.e., one third of the penalty permitted by the statute.  *Id.*

Notably, the defendant owned and managed the business and was directly involved in transmitting the funds, including transporting cash from Central America and Chile into the U.S. via airplane.  *Id.*;  *see also United States v. Habbal*, 05-CR-83,  2005 WL 2674999 at *1, 6 (E.D. VA Oct. 17, 2005) (imposing non-Guidelines sentence of 12 months imprisonment for § 1960 violation where defendant in CHC I with advisory range of 37-46 months).

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), a securities fraud case in which the Guidelines calculated under § 2B1.1 resulted in an advisory range of imprisonment of 360 months to life, the Court imposed a sentence of 60 months imprisonment.  *Id.*  Though not a § 1960 prosecution, in light of the fact that the Guidelines were calculated under § 2B1.1, we submit that the case is relevant.

In recounting its reasons for the substantial variance from the advisory Guidelines range, the Court found that adherence to the arithmetical approach of the Guidelines would yield a grossly unfair sentence in part due to the need to avoid unwarranted disparities in sentencing.  *Id.* at 750-51 (finding that the ability to impose a non-Guidelines sentence helps avoid "'the utter

travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.'" *Id*. at 751 (quoting *United States v. Adelson,* 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006)).

The Government is likely to focus the Court's attention on *United States v. Elfgeeh*, 515 F.3d 100 (2d Cir. 2013), a § 1960 prosecution in which sentences of 188 months and 51 months were affirmed. *Id*. at 107, 113, 117. *Elfgeeh*, however, is inapposite because it was a case with powerful evidence that the money transmitted was supporting terrorism—there were checks with the notations "for the Jihad" and "mujahidin" written by one of the defendants. *Id*. at 107, 113, 117; *see also United States v. Abdullahi*, 520 F.3d 890, 891, 894 (8th Cir. 2008) (affirming Guidelines sentence of 41 months where defendant transmitted approximately $1.6 Million to Somalia—a country known to support terrorism—and the Court found that the defendant had not been truthful about the income he derived from the business and the nature of his business— which involved receiving cash from his customers).

Unlike the defendants in *Elfgeeh* and *Abdullahi*, this case has no connection whatsoever to terrorism. Moreover, as in the cases in which Courts have imposed sentences considerably below the Guidelines—as discussed throughout this Memorandum—this case involves a number of mitigating factors, including the fact that FinCEN itself recognized that, up until March 2013, it was unclear whether businesses such as LR were required to register.

Accordingly, we respectfully submit that the need to avoid sentence disparities warrants an exercise of the Court's discretion and the imposition of a sentence below the effective Guidelines sentence. The acknowledgement of Courts in § 1960 prosecutions that the Guidelines—even when tempered by a statutory maximum—result in sentences that far exceed what is reasonable is equally applicable in the instant case.

45

**E.      Additional Factors Under § 3553(a) Support a Non-Guidelines Sentence.**

The remaining § 3553(a) factors also support a non-Guidelines sentence.  In view of the

issues discussed above, it is our position that a non-Guidelines sentence would adequately

"reflect the seriousness of the offense, . . . promote respect for the law, and provide just

punishment for the offense."

Moreover, we respectfully submit that a non-Guidelines sentence would serve as an

adequate deterrer for others, as well as protect the public from any future criminal conduct by

Marmilev, which, we submit, is highly unlikely.  As has been noted, a relatively short sentence

can have a strong deterrent effect in certain instances:

> As for prison time, the Court concluded that, notwithstanding all the mitigating
> factors outlined above, meaningful prison time was necessary to achieve
> retribution and general deterrence.  But as to the latter, **there is a considerable
> evidence that even relatively short sentences can have a strong deterrent
> effect on prospective "white collar" offenders**.  *See, e.g.,* Richard Frase,
> *Punishment Purposes,* 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj,
> *Imprisoning White Collar Criminals?,* 23 S. Ill. U. L.J. 485, 492 (1998).  *Cf.*
> United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56
> (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a
> *short but definite* period of confinement for a larger proportion of these 'white
> collar' cases, both to ensure proportionate punishment and to achieve deterrence")
> (emphasis supplied); transcript of sentence, *U.S. v. Saad,* 1/17/06, at 33 (similar
> remarks of Government prosecutor at time of Dr. Saad's sentence).

*Adelson*, 441 F. Supp. 2d at 514 (bold supplied) (imposing non-Guidelines sentence of 42

months imprisonment based upon § 3553(a) factors where Guidelines called for life

imprisonment).

Marmilev has no criminal record and has already endured considerable punishment in the

harsh confines of the Metropolitan Correctional Center.  *See United States v. Behr*, 03-CR-1115

(RWS), 2006 WL 1586563, *4-5 (S.D.N.Y. June 9, 2006) (sentencing defendant in mail fraud

case in CHC V with Guidelines range of 37-46 months to time-served of 29 months based in part

on harsh conditions of pretrial detention in MCC).  Having tasted the bitter realities of

confinement in a federal correctional facility, Marmilev will be more than diligent in the future

about avoiding running afoul of the law.  *Fregoso-Bonilla*, 2007 WL 4358326 at \*3 (imposing

non-Guidelines sentence based in part on determination that two-year criminal process had a

serious impact on defendants).

Moreover, for Marmilev, the fact of being labeled a felon is in and of itself a considerable

penalty.  In addition, the Court can also consider the fact that because Marmilev is deportable, he

will not be eligible for the six to 12 months in a community confinement center that non-

deportable defendants typically receive.  *See, Keleta*, 552 F.3d at 863 (reducing sentence by six

months because defendant was deportable).  Indeed, beyond any penalty the Court imposes,

Marmilev will likely be detained in an immigration facility for a considerable period of time.

In the post-*Booker* era, in considering the kinds of sentences available, there are many

arrows in the Court's quiver and we submit that in light of the unique facts of the instant case,

something other than a Guidelines sentence is warranted.  *See Gall*, 128 S. Ct. at 593 (upholding

sentence of probation in ecstasy distribution case and quoting district court's characterization of

probation as "'a substantial restriction of freedom'" and not "an act of leniency'").

Based upon all of the above, we respectfully submit that the factors set forth in § 3553(a)

weigh in favor of a sentence below the effective Guidelines sentence.

## Conclusion

For the foregoing reasons, Marmilev respectfully submits that a sentence substantially below the effective Guidelines sentence would be sufficient but not greater than necessary to achieve the goals set forth in 18 U.S.C. § 3553(a).

Dated:  New York, New York
        December 2, 2014

Respectfully submitted,

s/SETH GINSBERG
Attorney at Law
299 Broadway, Suite 1405
New York, New York 10007
212-537-9202
srginsberg@mac.com

*Attorney for Mark Marmilev*